In the Interest of JL, a Minor.

PL, Appellant (Respondent),

v.

**JOHNSON COUNTY DEPARTMENT OF PUBLIC ASSISTANCE AND SOCIAL SERVICES, Appellee (Petitioner).**

No. C–88–1.

Supreme Court of Wyoming.

Sept. 23, 1988.

Mark J. Murphy of Shoumaker and Murphy, Sheridan, for appellant.

Joseph B. Meyer, Atty. Gen., Peter J. Mulvaney, Deputy Atty. Gen., and Richard E. Dixon, Asst. Atty. Gen., for appellee.

Before CARDINE, C.J., THOMAS, URBIGKIT and MACY, JJ., and BROWN, J.*, Ret.

URBIGKIT, Justice.

This appeal is taken from an order terminating the parental rights of the mother, PL (appellant), with respect to her three-year-old daughter, JL. Upon appeal, appellant challenges the procedural and evidentiary sufficiency of those proceedings. She presents two issues for review:

1. Should the trial court be reversed because the natural mother was not initially advised of her right to counsel and

the child was not appointed counsel in the initial juvenile court proceeding?

2. Should the trial court be reversed because there was insufficient evidence to establish that an authorized agency or mental health professional has been unsuccessful in rehabilitating the mother or that the mother refused rehabilitation treatment?

We affirm.

## I.  FACTS

Embracing distinctly unpleasant facts, this record indicates that JL was born in Georgia on November 15, 1984. Appellant, herself a product of parental abandonment and foster homes, was eighteen and married at the time of the child's birth. Shortly after JL's birth, the parents separated and appellant initiated divorce proceedings. For practical purposes, with one brief interlude, the father disappeared from this scenario, and within a year, appellant and JL moved to California where JL's grandmother lived. Shortly after arrival, appellant met JH, a young man from Buffalo, Wyoming. Within two or three days of meeting, the three people moved to Buffalo, Wyoming as a culmination of an extremely quick romance. Arriving in Buffalo on New Year's Eve 1985, the three moved in with JH's parents and stayed until January 24 or 25, 1986, when they established a separate residence.[1] Apparent subsistence was derived from appellant's acquisition of emergency Department of Public Assistance and Social Services welfare benefits.

In the evening of January 27, 1986, appellant took JL to the emergency room of Johnson County Memorial Hospital, reporting to medical personnel that the baby girl had been "acting ill." The attending physician testified that JL had multiple bruises over her entire body, was in shock, dehydrated, in a state of cardiovascular collapse and respiratory distress, and had a mark-

---

* Retired June 30, 1988.

1. The file suggests that JH was of high school age and the entire sequence of meeting in California, immediate relationship, move to Buffalo, child abuse and his ·suicide, has a large measure of near unbelievability in human trage-

dy for everyone involved. Total elapsed time from meeting in California to JH's suicidal death in Wyoming was only about two months. It took merely one month for the child abuse to occur.

edly distended abdomen. Police and Johnson County Department of Public Assistance and Social Services (Johnson County D–PASS) officials were summoned to investigate suspected child abuse. Unpleasantly descriptive photographs of the injuries were taken.

After JL was stabilized, she was flown to Billings, Montana on an emergency life flight, whereupon emergency abdominal surgery was performed to repair a perforation of the stomach. The initial and final diagnosis of medical personnel in Billings was that the injuries were of nonaccidental origin and fit the diagnosis of the "battered child syndrome." The treating physician in Billings stated JL "came as close to dying as is possible." JL remained hospitalized for over one month, enduring further abdominal surgeries, and then was placed in foster care in Billings until August 1987, in order to receive outpatient medical treat-

ment. In addition to the physical injuries, this death's door child evidenced severe emotional harm, including an inability to cry or express pain.

Appellant was interviewed on January 27, 1986 by police and the Johnson County D–PASS director. Appellant first reported that the injuries occurred when JL fell out of her stroller onto a fireplace hearth while being cared for by JH. Both appellant and JH were subsequently arrested and charged with felony child abuse.[2] A plea agreement was reached with appellant wherein the charges against her were reduced to two counts of reckless endangerment in return for her agreement to testify against JH. Although appellant finally admitted that she may have caused some of the less serious injuries,[3] the police concluded that JH was responsible for the life-threatening injuries. He committed suicide before trial and, on her guilty pleas to

**2.** We note that this societal problem has yielded a great number of interesting and provocative law review articles outlining the vast history and possible solutions to this dilemma, which was not formally identified until 1962. For examples, see: Besharov, *"Doing Something" about Child Abuse: The Need to Narrow the Grounds for State Intervention,* 8 Harv.J.L. & Pub. Pol'y 539 (1985); Boskey and McCue, *Alternative Standards for the Termination of Parental Rights,* 9 Seton Hall L.Rev. 1 (1978); Fraser, *A Glance at the Past, A Gaze at the Present, A Glimpse at the Future: A Critical Analysis of the Development of Child Abuse Reporting Statutes,* 54 Chi.–Kent L.Rev. 641 (1978); Fraser, *Independent Representation for the Abused and Neglected Child: The Guardian Ad Litem,* 13 Cal. W.L.Rev. 16 (1976); Ketcham and Babcock, *Statutory Standards for the Involuntary Termination of Parental Rights,* 29 Rutgers L.Rev. 530 (1976); Areen, *Intervention Between Parent and Child: A Reappraisal of the State's Role in Child Neglect and Abuse Cases,* 63 Geo.L.J. 887 (1975); and Thomas, *Child Abuse and Neglect Part I: Historical Overview, Legal Matrix, and Social Perspectives,* 50 N.C.L.Rev. 293 (1972).

**3.** There is a plethora of authority based on varying statutory language that regardless of whether a parent actually inflicts the injuries, that parent's rights can be terminated for a failure to protect the child from others. See, for example: *Matter of Maricopa County Juvenile Action Nos. JS–4118/JD–529,* 134 Ariz. 407, 656 P.2d 1268 (1982); *Wood v. State,* 248 Ark. 109, 450 S.W.2d 537 (1970); *In Re Amos L.,* 124 Cal.App.3d 1031, 177 Cal.Rptr. 783 (1981); *In Re Biggs,* 17 Cal. App.3d 337, 94 Cal.Rptr. 519 (1971); *In Re Cor-*

*rigan,* 134 Cal.App.2d 751, 286 P.2d 32 (1955); *In Re Halamuda,* 85 Cal.App.2d 219, 192 P.2d 781 (1948); *People in Interest of C.R. v. E.L.,* 38 Colo.App. 252, 557 P.2d 1225 (1976); *In Interest of D.E.N.,* 504 So.2d 514 (Fla.App.1987); *Re Interest of R.A.L.,* 440 So.2d 473 (Fla.App.1983); *Dornburg v. McKellar,* 204 Ga. 189, 48 S.E.2d 820 (1948); *Interest of Castro,* 102 Idaho 218, 628 P.2d 1052 (1981); *In Interest of J.R.,* 130 Ill.App.3d 6, 85 Ill.Dec. 410, 473 N.E.2d 1009 (1985); *In Interest of Brown,* 86 Ill.2d 147, 56 Ill.Dec. 4, 427 N.E.2d 84 (1981); *In Interest of Dodge,* 8 Kan.App.2d 259, 655 P.2d 135 (1982); *Dean v. Mizell,* 159 La. 975, 106 So. 534 (1925); *Matter of Rinesmith,* 144 Mich.App. 475, 376 N.W.2d 139 (1985); *Matter of Welfare of Maas,* 355 N.W.2d 480 (Minn.App.1984); *In Re Interest of Goodon,* 208 Neb. 256, 303 N.W.2d 278 (1981); *Matter of Alyne E.,* 113 Misc.2d 307, 448 N.Y.S.2d 984 (1982); *In Re J.Z.,* 190 N.W.2d 27 (N.D.1971); *Matter of R.,* 62 Or.App. 288, 659 P.2d 1027 (1983); *Matter of D.A.B.,* 313 N.W.2d 787 (S.D.1981); *Matter of A.I.,* 289 N.W.2d 247 (S.D.1980); and A. Haralambie, Handling Child Custody Cases § 13.08 at 71 (1983 & Supp.1987). See also *In Re S.,* 66 Misc.2d 683, 322 N.Y.S.2d 170 (1971) for the proposition that res ipsa loquitur can apply in the child abuse situation to help determine who inflicted the injuries.

Further, see A. Haralambie, supra at § 12.09, describing "medical" neglect which also occurred in this case by appellant not seeking medical attention for JL sooner. ("Parents have 'a "high duty" to recognize symptoms of illness and to seek and follow medical advice.' Failure to do so may constitute medical neglect." Id. 322 N.Y.S.2d at 173.)

reckless endangerment, appellant was given a probationary sentence of one year.

Upon the petition of the county attorney's office, an order was entered on January 28, 1986, as the day of the injury report and hospitalization, placing JL in the temporary protective custody of Johnson County D–PASS. Further orders continuing such custody were entered on February 11, 1986 and May 5, 1987. In June 1986, the child care agency developed a rehabilitation plan with appellant for the stated objective of returning JL to her care. Approximately one month later, however, appellant left Buffalo and returned to Georgia, effectively ending her participation in the treatment plan. Care, custody and control of JL continued in the governmental agency. So also ended Chapter I of the life of JL, the baby girl, now aged nearly two, who almost totally by accident became a responsibility of the State of Wyoming.

On February 24, 1987, an order was entered by the district court appointing counsel to represent appellant; a few months later, a guardian ad litem was appointed for JL. Seeking finality of their twenty months of responsibility, the Johnson County and Prosecuting Attorney on behalf of Johnson County D–PASS, filed a petition on September 22, 1987 to terminate parental rights of both parents. The father voluntarily relinquished. Appellant, through appointed counsel, contested. Following trial, the district court entered an order terminating appellant's parental rights. In the termination order from which this appeal is taken, the district court made the following specific findings:

2. THE COURT FURTHER FINDS:

(a) That the minor child has been in the protective custody of the Johnson County Department of Public Assistance and Social Services for an extended period, in excess of one year;

(b) That the minor child was originally taken into protective custody by the Johnson County Department of Public Assistance and Social Services due to severe physical abuse and neglect;

(c) That [PL] has failed to contribute, in any significant manner, toward the support and maintenance of the minor child since prior to January 27, 1986;

(d) That all rehabilitative efforts have failed;

(e) That there have been no substantive contacts with the minor child by [PL] for a period in excess of one year; and,

(f) That the minor child's health, stability and safety would be seriously jeopardized by returning the minor child to her natural mother.

## II. PROCEDURAL INADEQUACY OF APPOINTMENT OF COUNSEL

Appellant argues that the termination proceedings were constitutionally and statutorily defective in that, upon initially ordering temporary protective custody of JL, the district court neither appointed counsel to represent JL nor advised appellant of her right to counsel.

In the emerging situation, the district court ordered JL placed in temporary protective custody on January 28, 1986,[4] and further ordered continued protective custody on February 11, 1986 and May 5, 1987. We distinguish the care, custody and control status began in January 1986 and thereafter continued without contest from the subsequent termination initiated by a petition filed twenty months later. See *South Carolina Dept. of Social Services v. Vanderhorst*, 287 S.C. 554, 340 S.E.2d 149, 151 (1986) (two distinct stages were involved: the removal and the termination. However, the court found that, since the petition to terminate relied on factual findings from the removal hearing, the petition to terminate should have been denied when no counsel was afforded the parent); *Petition of Catholic Charitable Bureau of Archdiocese of Boston, Inc., to Dispense with Consent to Adoption*, 392 Mass. 738,

---

**4.** While the temporary protective custody provision contained in W.S. 14–3–208(c) only envisions the temporary-care time frame of seventy-two hours, appellant has not on appeal nor at the trial level challenged the initial temporary protective custody order or the two orders which extended the custody as exceeding the time period. Thus, we decline to address the propriety of a possible time issue as it relates to the three orders.

467 N.E.2d 866, 869 (1984) (discussing "the settled distinction between custody and termination proceedings"); *Matter of Evans,* 81 N.C.App. 449, 344 S.E.2d 325, 327 (1986) (different standards apply to removal rather than termination proceedings); and *State in Interest of Alexander,* 384 So.2d 1003, 1005 (La.App.1980) (a temporary protection order and its expiration did not affect separately brought child abuse proceedings).[5] The goal of the temporary custodial transfer has been explained as:

> "It is not the quality or character of parental conduct per se that justifies State intervention on behalf of an abused, neglected, or otherwise endangered child. Rather, it is the fact of the endangerment itself. As parens patriae the State ... acts to protect endangered children." *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. 573, 591–592, 421 N.E.2d 28 (1981). * * *
>
> * * * The focus of such a [termination] proceeding is not whether the parent should be deprived of "custody" in order to safeguard the child's well-being, but rather whether "it would be in the best interests of the child *for all legal relations [with the parent] to be ended"* (emphasis added). *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption,* 391 Mass. 113, 119, 461 N.E.2d 186 (1984). "Termination denies the natural parents physical custody, as well as the rights ever to visit, communicate with, or regain custody of

the child." *Santosky v. Kramer,* 455 U.S. 745, 749, 753, 102 S.Ct. 1388, 1392, 1393, 71 L.Ed.2d 599 (1982). *Petition of Catholic Charitable Bureau,* 467 N.E.2d at 868–69.

In a termination adjudication, the rights of the parent are implicitly a consideration along with the best interests of the child; each of these constitutional interests may diverge. See *Matter of Welfare of J.J.B.,* 390 N.W.2d 274 (Minn.1986); *Matter of Welfare of D.C.,* 415 N.W.2d 915, 917 (Minn.App.1987); *Matter of Welfare of D.I.,* 413 N.W.2d 560, 564 (Minn.App.1987); *Matter of Welfare of D.F.B.,* 412 N.W.2d 406, 410 (Minn.App.1987); and Comment, *Minnesota Adopts a Best Interests Standard in Parental Rights Termination Proceedings: In re J.J.B.,* 71 Minn.L.Rev. 1263, 1269 (1987). Although the best interests of a child would ordinarily be in the custody of his natural parents, where

> the record demonstrates a long-term placement characterized by a repeated failure of reasonable efforts to reunite the family, the trial court should appropriately determine what action most readily promotes the best interests of the child. While judicial caution in severing the family bonds is imperative, untoward delay of the demonstrated inevitable is intolerable.

*Matter of Welfare of J.J.B.,* 390 N.W.2d at 280. Different standards are applicable to the two stages since neglect can be established prospectively while termination is concerned with past parental conduct. *In*

---

**5.** For further support of this view see: Boskey and McCue, supra n. 2, 9 Seton Hall L.Rev. at 4 (which contrasts the "custody order" and the termination order relying on the point that temporary removal "does not eliminate the parent's residual right to reclaim the child at some later date"); Wald, *State Intervention on Behalf of "Neglected" Children: Standards for Removal of Children from Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights,* 28 Stan.L.Rev. 625 (1976) (some state statutes generate confusion by using the term "termination" to describe both temporary and permanent loss of parental custody); Comment, *Termination of Parental Rights: Putting Love in Its Place,* 63 N.C.L.Rev. 1177, 1178 n. 16 (1985) ("neglect proceedings typically precede—and are distinct from—actions for termination of parental rights"); Comment, *Termi-*

*nation of Parental Rights and The Lesser Restrictive Alternative Doctrine,* 12 Tulsa L.J. 528 (1977) (where the terms custody hearing and termination hearing are used to describe the two steps); Comment, *Termination of Parental Rights in Adoption Cases: Focusing on the Child,* 14 J.Fam.L. 547, 555 (1975–1976) (the rights of the parent on temporary removal are "only temporarily severed and are in effect 'held in abeyance' "); Note, *Legislative and Judicial Recognition of the Distinction Between Custody and Termination Orders in Child Neglect Cases,* 7 J.Fam. L. 66 (1967); Note, *Termination of Parental Rights,* 13 Wyo.L.J. 185, 186 (1959) (termination is "an additional step"); A. Haralambie, supra at § 12.01; and 4 J. McCahey, M. Kaufman, and C. Kraut, Child Custody & Visitation Law and Practice § 28.01[2] at 28–6 (1988).

*Interest of J.L.P.,* 416 So.2d 1250, 1252 n. 3 (Fla.App.1982); *Matter of Evans,* 344 S.E. 2d 325. "While custody is freely granted for the temporary protection of a child against impending harm, termination reflects a decision that no substantial likelihood exists that a proper parent-child relationship is capable of being restored in the future." Boskey and McCue, *Alternative Standards for the Termination of Parental Rights,* 9 Seton Hall L.Rev. 1, 4 (1978).

This is an unusual appeal in which this Court is being asked to pass upon the sufficiency of evidence to support findings of dependency and neglect at the removal, rather than at the termination, stage. Respondent makes a very forceful argument, citing the termination cases, that the evidence is so scanty in this case that it does not rise to the level necessary to support the conclusion of neglect and dependency. While we would be inclined to agree with respondent's position if this were a termination case, we believe that a different standard applies at the removal stage and that the *removal* was therefore proper.

\*    \*    \*    \*    \*    \*

\* \* \* There is a substantive difference between the quantum of adequate proof of neglect and dependency for purposes of termination and for purposes of removal. The most significant difference is that while parental rights may not be terminated for threatened future harm, the DSS may obtain temporary custody of a child when there is a *risk of neglect* in the future. See *In re Phifer,* 67 N.C. App. 16, 26, 312 S.E.2d 684, 689 (1984) (emphasis added).

*Matter of Evans,* 344 S.E.2d at 327.

A.   *Guardian ad Litem for the Child.*

■ We address first the alleged failure to timely appoint a guardian ad litem [6] for JL. W.S. 14-2-312 provides, with respect to termination proceedings, that:

> *After the petition has been filed,* the court shall appoint a guardian ad litem to represent the child unless the court finds the interests of the child will be represented adequately by the petitioner or another party to the action and are not adverse to that party.

(Emphasis added.) The mandate of the above statute was unquestionably satisfied by the appointment of a guardian ad litem four months before the petition to terminate was filed. Appellant, however, refers us to W.S. 14-3-211, which is found under the statutes governing child protection services rather than the termination statutes. W.S. 14-3-211 provides:

> (a) The court shall appoint counsel to represent any child *in a court proceeding* in which the child is alleged to be abused or neglected. Any attorney rep-

---

**6.** The emergence of the trend of appointing guardians ad litem was sparked by the federal legislation of the Child Abuse Prevention and Treatment Act of 1974, 42 U.S.C. §§ 5101–07 (1976 & Supp. V 1981), which specifically mandated in 42 U.S.C. § 5103(b)(2)(G) that for a state to qualify for assistance under this subsection, the state shall "provide that in every case involving an abused or neglected child which results in a judicial proceeding a guardian ad litem shall be appointed to represent the child in such proceedings \* \* \*." Comment, *The Non-Lawyer Guardian Ad Litem in Child Abuse and Neglect Proceedings: The King County, Washington, Experience,* 58 Wash.L.Rev. 853, 855 (1983). For articles which discuss the guardian ad litem's role in the child abuse arena, see Fraser, supra n. 2, 13 Cal.W.L.Rev. 16 and Comment, *Protecting the Interests of Children in Custody Proceedings: A Perspective on Twenty Years of Theory and Practice in the Appointment of Guardians Ad Litem,* 12 Creighton L.Rev. 234 (1978).

Three classifications occur in the jurisdictions regarding this issue; the three approaches include: "(1) an absolute right to counsel for the abused child, (2) a non-absolute right or discretionary right to appointed counsel, and (3) no right to counsel." Note, *Domestic Relations— Appointment of Counsel for the Abused Child— Statutory Schemes and the New York Approach,* 58 Cornell L.Rev. 177, 180 (1972). The Model Juvenile Court Act § 26 (1985) further supports the view that a guardian should be appointed and takes an absolute approach since it "contains an absolute counsel provision: 'Counsel must be provided for a child not represented by his parent, guardian or custodian. If the interests of 2 or more parties conflict separate counsel shall be provided for each of them.' \* \* \* The *Model Rules for Juvenile Courts* provides for mandatory appointment of counsel whenever parent-child conflict is present, as in abuse proceedings." (Emphasis in original.) Note, supra, 58 Cornell L.Rev. at 181.

resenting a child under this section shall also serve as the child's guardian ad litem unless a guardian ad litem has been appointed by the court. The attorney or guardian ad litem shall be charged with representation of the child's best interest.

(b) The court may appoint counsel for any party when necessary in the interest of justice.

(Emphasis added.) "Court proceeding" in relation to W.S. 14–3–211(a) is defined in W.S. 14–3–202(a)(v) in this manner:

"Court proceedings" means child protective *proceedings which have as their purpose* the protection of a child through *an adjudication of whether the child is abused or neglected,* and the making of an appropriate order of disposition.

(Emphasis added.)

In *Matter of Child X,* 617 P.2d 1078, 71 L.Ed.2d 849 (Wyo.1980), decided before the enactment of W.S. 14–2–312, we said that compliance with W.S. 14–3–211(a) is mandatory prior to adjudicating the substantive issues and it was improper, therefore, in that case to *terminate* parental rights without appointing counsel to represent the child. The concurring opinion in that case questioned whether W.S. 14–3–211(a) was intended to apply to termination proceedings brought pursuant to the termination statutes then in effect.[7] Subsequently, the present termination statutes were enacted

specifically requiring appointment of a guardian ad litem for the child upon the filing of the petition. W.S. 14–2–312. We need not reach the question of whether W.S. 14–3–211 is applicable to a termination hearing, however, because the procedure utilized in the instant case fulfilled the requirements of both statutes.

■ A guardian ad litem was appointed prior to the adjudication of any substantive issues.[8] We conclude that, by appointing a guardian ad litem four months before the termination petition was filed, the district court more than adequately complied with the applicable statutes and protected the interests of JL. By this discussion, we do not determine whether a court-appointed guardian ad litem should earlier have been appointed, and particularly so, if contest existed, with JL at death's door in emergency care status in the Billings hospital.[9] We conclude that JL's interest in the termination proceeding was adequately protected by seasonable appointment of a guardian ad litem. This is the best interest of the child concern and protective requirement as invoked in the termination statute by request for guardian ad litem appointment. W.S. 14–2–312.

### B. *Attorney For Appellant.*

■ We next address appellant's assertion that the district court committed re-

---

**7.** The prior termination statutes, W.S. 14–2–301 through 14–2–307 (1978 Replacement), were repealed in 1981, and replaced by current W.S. 14–2–308 through 14–2–319. The earlier termination provisions did not have an equivalent to W.S. 14–2–312 (1986 Replacement), requiring appointment of a guardian ad litem after the petition is filed.

This area of the law can truly be described as "ever changing."

Child abuse legislation, especially the reporting statute, has had a remarkable history. Perhaps, no other type of legislation has so quickly gained acceptance, has been so widely proclaimed as a panacea, and has been so often amended and rewritten in such a short period of time.

Fraser, supra n. 2, 54 Chi.–Kent L.Rev. at 684. For an analysis of Wyoming's metamorphosis, see Arnold and Hurd, *Child Protection: A Suggested Role For Members of the Wyoming State Bar,* IX Land & Water L.Rev. 187 (1974); Comment, *Family Law—Wyoming's New Termi-*

*nation of Parental Rights Statute,* XVII Land & Water L.Rev. 621 (1982); Note, *Family Law— Termination of Parental Rights: Establishing Standards for the Wyoming Law. In the Matter of Parental Rights to X, Y, and Z, DS v. Dept. of Public Assistance & Social Services, 607 P.2d 911 (Wyo.1980),* XVI Land & Water L.Rev. 295 (1981); and Note, *Termination of Parental Rights,* supra n. 5, 13 Wyo.L.J. 185.

**8.** In fact, the guardian ad litem was appointed in the same order which requested the home study of both parents well before the termination hearing was even set.

**9.** See *Parker v. Children Services Bd. of Trumbull County,* 21 Ohio App.3d 115, 487 N.E.2d 341, 342 (1984), where the Ohio Court of Appeals found that due process did not require the appointment of a guardian ad litem at a temporary custody hearing because of the emergency situation which existed with the child.

versible error by not initially advising her of her right to counsel. This then is the parental right inquiry. For this proposition, appellant relies upon W.S. 14-6-222(a), which provides:

> At their first *appearance before the court* the child and his parents, guardian or custodian shall be advised by the court of their right to be represented by counsel at every stage of the proceedings including appeal, and to employ counsel of their own choice.

(Emphasis added.) We first observe no actual appearance resulted in connection with the temporary protective custody orders. JL was in emergency placement in Montana and appellant was facing felony charges that could have included homicide. More important, however, we perceive that W.S. 14-6-222(a) is inapplicable to a termination proceeding. Although Chapter 6 of Title 14, W.S. 14-6-101 through 14-6-243, encompasses provisions dealing with both delinquent and neglected children, W.S. 14-6-222 clearly applies to delinquency type proceedings.

█ We rejected an argument similar to appellant's in *State in Interest of C*, 638 P.2d 165 (Wyo.1981). In that case, the mother questioned the jurisdiction of the court to revoke custody of her children because of an alleged failure to comply with, inter alia, W.S. 14-6-209, which requires in subsection (b)(ii) that a child and

his parents be advised of their right to counsel as provided by W.S. 14-6-222. We held that the required advice in W.S. 14-6-209(b) applied only to delinquency proceedings. *State in Interest of C*, 638 P.2d at 171. The district court has discretionary authority to appoint counsel for a parent in termination proceedings as separately addressed in W.S. 14-2-318(a), which provides: "[t]he court *may* appoint counsel for any party who is indigent." (Emphasis added.) The statute pertaining to the appointment of counsel in neglected child status cases is not material to the appropriately provided legal assistance evidenced prior to commencement of the termination proceeding.[10]

█ In the instant case, the district court appointed counsel for appellant seven months before initiation of termination proceedings. Moreover, the time for appeal regarding any quarrel appellant may have had with the appointment of counsel for the dependency aspect of this case had long since expired by the time the termination order was entered. Thus, we do not decide whether appellant should have been appointed counsel at the dependency stage[11] or even informed of such a right. See *Matter of Welfare of J.J.B.*, 390 N.W.2d at 281 (the dependency hearing had to be appealed within thirty days of the order); *Matter of Welfare of G.B.N.*, 412 N.W.2d

---

**10.** The United States Supreme Court in *Lassiter v. Department of Social Services of Durham County, North Carolina*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640, reh. denied 453 U.S. 927, 102 S.Ct. 889, 69 L.Ed.2d 1023 (1981) held that the due process clause of the Fourteenth Amendment does not require the appointment of counsel in every parental termination proceeding, but left it to the states to be more liberal in providing such appointment if desired. For further discussion of this issue, see: Catz and Kuelbs, *The Requirement of Appointment of Counsel for Indigent Parents in Neglect or Termination Proceedings: A Developing Area*, 13 J.Fam.L. 223 (1973-1974) and Comment, *The Indigent Parent's Right to Appointed Counsel in Actions to Terminate Parental Rights*, 43 U.Cin. L.Rev. 635 (1974).

**11.** The jurisdictions have taken many different approaches to this problem of whether an indigent parent should be appointed counsel in a

dependency hearing. Cf. *In Interest of D.B.*, 385 So.2d 83, 87 (Fla.1980) (where the court held that a right to counsel would be allowed when permanent loss of parental custody was threatened, however, in all other circumstances a case-by-case approach would be taken); *Matter of M.D.Y.R.*, 177 Mont. 521, 582 P.2d 758, 764 (1978) (where the Montana Supreme Court found no denial of due process when the mother was not appointed counsel in a temporary custody hearing); and *State ex rel. Juvenile Dept. of Multnomah County v. Grannis*, 67 Or. App. 565, 680 P.2d 660 (1984) (where the court suggested a case-by-case analysis and lists several factors to consider in appointing counsel for a parent in a dependency proceeding). See also Besharov, *Terminating Parental Rights: The Indigent Parent's Right to Counsel after Lassiter v. North Carolina*, 15 Fam.L.Q. 205, 210 (1981); Catz and Kuelbs, supra n. 10, 13 J.Fam.L. 223; and Note, *Child Neglect: Due Process for the Parent*, 70 Colum.L.Rev. 465, 475-76 (1970).

415, 417 (Minn.App.1987); and W.R.A.P. 2.01.

## III. SUFFICIENCY OF THE EVIDENCE

Appellant next challenges the sufficiency of the evidence supporting the district court's finding that rehabilitative efforts had failed. This is clearly and appropriately the substantive challenge to the adjudication displaying the external conflict or divergence between best interest of the child and the constitutional rights of the parent. Having found constitutional due process, we now address sufficiency of the evidence for termination.

■■■ Our standard of evidentiary review in termination cases is well established. Application of termination statutes are subject to strict scrutiny. *In Interest of JG*, 742 P.2d 770, 773 (Wyo.1987); *TR v. Washakie County Dept. of Public Assistance and Social Services*, 736 P.2d 712 (Wyo.1987); *Matter of Parental Rights of PP*, 648 P.2d 512 (Wyo.1982). We invoke the strict scrutiny standard because of the conflict between the fundamental liberty of familial association and the compelling interest of the state in protecting the welfare of the children. *TR*, 736 P.2d 712; *Matter of MLM*, 682 P.2d 982 (Wyo.1984). Under the strict scrutiny standard, we require the state to prove its case by clear and convincing evidence. *In Interest of JG*, 742 P.2d 770; *Matter of GP*, 679 P.2d 976 (Wyo. 1984). At the same time, the concern of an enlightened society for the best interest of the defenseless child must predominate. *Matter of MLM*, 682 P.2d 982.

■■■ Although we require clear and convincing evidence under the strict scrutiny standard, we examine the evidence in the light most favorable to Johnson County D–PASS, assuming favorable evidence to be true and leaving out of consideration conflicting evidence presented by the unsuccessful party. *TR*, 736 P.2d 712; *Matter of Parental Rights of PP*, 648 P.2d 512. Additionally, we give the evidence of the successful party the benefit of every favorable inference which may fairly be drawn

from it. *In Interest of JG*, 742 P.2d 770; *TR*, 736 P.2d 712.

W.S. 14–2–309 establishes the grounds for the termination of parental rights. In pertinent part, the statute provides:

(a) The parent-child legal relationship may be terminated if any one (1) or more of the following facts is established by clear and convincing evidence:

(i) The child has been left in the care of another person without provision for the child's support and without communication from the absent parent for a period of at least one (1) year. In making the above determination, the court may disregard occasional contributions, or incidental contacts and communications;

\*    \*    \*    \*    \*    \*

(iii) The child has been abused or neglected by the parent and efforts by an authorized agency or mental health professional have been unsuccessful in rehabilitating the family or the family has refused rehabilitative treatment, and it is shown that the child's health and safety would be seriously jeopardized by remaining with or returning to the parent.

In order to terminate parental rights under W.S. 14–2–309(a)(iii) the state must prove three elements:

(1) abusive treatment or neglect by the parent; (2) unsuccessful efforts to rehabilitate the family (i.e., termination of parental rights is the least intrusive means to satisfy the State's interest); and (3) the child's health and safety would be seriously jeopardized by remaining with or returning to the parent.

*Matter of GP*, 679 P.2d at 1005. See also *In Interest of JG*, 742 P.2d at 773.

Appellant narrows her evidentiary challenge to the second element of W.S. 14–2–309(a)(iii), i.e., unsuccessful efforts to rehabilitate the family. However, it is noted that an alternative basis for termination could have been found under W.S. 14–2–309(a)(i), which would be consistent with

the findings in the termination order.[12] As appellant framed her argument and focused our attention on the rehabilitation issue, we need not review, therefore, the extensive evidence of abuse and continuing danger established at trial.[13] With respect to efforts to rehabilitate, appellant argues that, rather than assisting in her rehabilitation, Johnson County D–PASS created an impossible obstacle course for her. The evidence does not support this contention.

■ In June 1986, Johnson County D–PASS developed a comprehensive rehabilitation plan with direct input from appellant. Pursuant to this plan, appellant agreed, among other things, to complete parenting classes, pursue a mental health and treatment program, and to establish and maintain regular visitation with JL in her foster home in Billings. Johnson County D–PASS contracted with Northern Wyoming Mental Health Center for counseling services. According to the rehabilitation plan, Johnson County D–PASS anticipated expenditures of $6,500 in completing the plan. Approximately one month after signing the plan, appellant abruptly left Buffalo and moved back to Georgia. At the time of leaving, appellant had not seen JL since February 1986, although stating that she wanted to do so. Appellant, in her brief, implies that it was the responsibility of Johnson County D–PASS to ensure appellant fulfilled the rehabilitation plan. It is apparently appellant's position that Johnson County D–PASS should have tracked her down in Georgia, arranged and paid for services by agencies in that state, and sent JL to Georgia for visits.[14] There is a limit to be asked of the agency in absence of parental cooperation.

---

**12.** See *In Re Conrich,* 221 Cal.App.2d 662, 34 Cal.Rptr. 658 (1963) (for the proposition that a child involuntarily taken from his parents may be left with another for a time sufficient to constitute abandonment) and Gordon, *Terminal Placements of Children and Permanent Termination of Parental Rights: The New York Permanent Neglect Statute,* 46 St. John's L.Rev. 215, 227 (1971) (for the view, depending on the behavior and intent of the parent, that it is possible for a child placed in foster care to be abandoned).

The fact that a judicial decree has placed custody of the child away from the parents does not, however, necessarily prevent or destroy the element of "leaving" because nonaction of the parents may convert into a leaving (and, the other elements present, into an abandonment) that which initially could not be regarded so. * * * The relevant nonaction of the parents is that of failure to contribute to support or to communicate, * * *, but the conclusion on this first point, that of "leaving," is that there may be such leaving even though originally a court decree has taken the custody of the child from the parents.

*In Re Conrich,* 34 Cal.Rptr. at 661.

**13.** The report from the Yellowstone County, Montana Child Protection Team after approximately fourteen months of involvement with JL as written to Johnson County D–PASS, was devastating as stating in part:

The recommendations from this C.P.T. were:
1. Parental rights should be terminated for both parents.
    a. It was felt that [PL] lacks the ability to learn to effectively parent [JL].
    b. [PL's] previous and recent lack of concern about [JL's] health support termination.
    c. The extent of [JL's] injuries at the hands of [PL] and her paramour support termination.
    d. [The father] has never contacted the hospital nor the physician regarding [JL's] injuries and health. He has never written nor called the Billings Social Worker to inquire about [JL].
    e. An unknown question remains as to high risk factor for [JL] if she were returned to either parent.
2. That [JL] remain with the foster parent, * * *, until:
    a. A decision has been made regarding permanency.
    b. That a familiar nurturing environment is needed for [JL] during her hernia repair surgery, and recuperation.
    c. That [the foster parent] remain in contact with [JL] in a grandmother role so that [JL] will be able to adjust to her new family. Our CPT realized that your agency has been working for the best interest of [JL] and we support the task your agency faces in petitioning for termination of parental rights and permanent custody of [JL].

The hospital staff, physicians, and social workers who have been involved with [JL] from the initial surgery to present, currently feel that parental rights should definitely be terminated. The need for physical and emotional commitment on the part of the parent should definitely be taken into consideration in regards to termination over the financial child support payments.

**14.** See *In Interest of JG,* 742 P.2d at 774 for the proposition that unsuccessful efforts to rehabilitate the family in Oklahoma could be used as a basis for a termination proceeding in Wyoming.

The utter failure of appellant to fulfill her obligations under the plan cannot be attributed to Johnson County D–PASS. We have reviewed the extensive record of the active efforts of Johnson County D–PASS to assist the parental rehabilitation of appellant and conclude that the evidentiary basis of the trial court decision was well established. The sufficiency of the evidence attack on this well-documented record fails.[15]

## IV. CONCLUSION

■■■ In sum, both JL's and the appellant's rights were adequately protected by the appointments of the guardian ad litem and counsel well in advance of the termination proceeding. The evidence sufficiently demonstrated that the best interests of JL required the termination so that this young child, still in her formative years, would not be cast upon the sea of "foster care drift."[16] We are reminded that

> [o]ur sympathy for the mother cannot blind us to the overriding concern for the welfare of the child. We cannot help the one and shall not harm the other.

*In Interest of J.L.P.,* 416 So.2d at 1253.

AFFIRMED.

15. In general, minimal efforts of appellant and maximum efforts of Johnson County D–PASS are to be seen. For example, appellant never visited JL between February 10, 1986 and the November 3, 1987 termination hearing, personally furnished little or no support or gifts, and totally failed to pursue the extensive Johnson County D–PASS rehabilitation plan. Initially stating an intent to get back together with the natural father, after a short re-established relationship, she lived with an old-time classmate for a further short time and then was living with a third man since returning to Georgia, by whom she was three month's pregnant at hearing date.

16. A term used to denote the current reflection that although at one time foster care was considered "temporary," today it has taken on proportions of a major source of custodial uncertainty and instability for the children. See Garrison, *Why Terminate Parental Rights?,* 35 Stan. L.Rev. 423, 426 (1983); Gordon, supra n. 12, 46 St. John's L.Rev. at 217; and Note, *In the Child's Best Interests: Termination of Parental Rights in Minnesota: In re J.J.B.,* 390 N.W.2d 274 (Minn. 1986), 10 Hamline L.Rev. 693 (1987). "Legislatures and courts have become increasingly cognizant that long-term foster care is not in a child's best interest and consequently have recognized a fundamental right of the child to a permanent home." Note, supra, 10 Hamline L.Rev. at 713.

> It is undisputed that children require secure, stable, long-term, continuous relationships with their parents or foster parents. There is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current "home," under the care of his parent or foster parents, especially when such uncertainty is prolonged.

*Lehman v. Lycoming County Children's Services Agency,* 458 U.S. 502, 513–14, 102 S.Ct. 3231, 3238–39, 73 L.Ed.2d 928 (1982).