**In the Matter of the Termination of Parental Rights of RJP, JSN, VME, and AJW, Minor Children.**

**ZLW, Appellant (Defendant),**

**v.**

**JOHNSON COUNTY DEPARTMENT OF PUBLIC ASSISTANCE AND SOCIAL SERVICES, Appellee (Plaintiff).**

**No. C–88–3.**

Supreme Court of Wyoming.

Sept. 26, 1988.

Thomas C. Wilson, of Tate & Wilson, Sheridan, for appellant.

Joseph B. Meyer, Atty. Gen., Peter J. Mulvaney, Deputy Atty. Gen., and Richard E. Dixon, Asst. Atty. Gen., Cheyenne, for appellee.

Paul G. Jarvis, guardian ad litem.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

GOLDEN, Justice.

Appellant ZLW seeks reversal of the district court's orders terminating her parental rights to her four minor children under the provisions of W.S. 14-2-309 (July 1986 Repl.). ZLW asserts the evidence failed to establish that:

1. The children had been left in the care of another person without provision for their support and without communication from ZLW for a period of at least one year, and

2. ZLW abused or neglected her children, Johnson County Department of Public Assistance and Social Services' (D-PASS) rehabilitation efforts on ZLW's behalf were unsuccessful, and the children's health and safety would be seriously jeopardized by remaining with or returning to ZLW.

We affirm the district court's termination of ZLW's parental rights to her four children under the provisions of W.S. 14-2-309(a)(iii), since after strict scrutiny we find the evidence clearly and convincingly established that ZLW abused and neglected her children, rehabilitation efforts were unsuccessful, and the children's health and safety would be seriously jeopardized if they remained with or were returned to ZLW.

D-PASS conceded, and we agree, the evidence was insufficient on appellant's first claim of error; therefore, we need not discuss that point. Since we rest our decision on a sufficiency of evidence determination, we also need not discuss the issue raised by D-PASS, and challenged by appellant, concerning the dispositive effect of appellant's alleged relinquishment of her children for adoption.

In addition to terminating ZLW's parental rights, the district court noted that the natural father of one of the children (JSN) was dead and subsequently terminated the parental rights of each father of the other children. No father has appealed that termination action.

ZLW was born on June 10, 1957. As a child from the age of seven to the age of fourteen she was a victim of her alcoholic stepfather's sexual molestation and abuse. At the age of fifteen she married to get away from that stepfather. The failure in the rehabilitation of ZLW is attributed to the trauma of her own childhood experiences which partially explains her inability to cope with the responsibilities of parenting.

RJP was born to ZLW and BP, her natural father, on September 22, 1976. JSN was born to ZLW and JN, his natural father, on September 11, 1979. VME was born to ZLW and BE, her natural father, on November 10, 1983. AJW was born to ZLW and GW, his natural father, on January 9, 1985. Thus, each child has ZLW as a common natural mother, but has a different natural father.

On the night of September 22, 1986, Sergeant Michael L. Dahmer of the police department in Buffalo, Wyoming, placed RJP, JSN, VME, and AJW into emergency protective shelter care because of an alcohol-induced, physically violent domestic quarrel between ZLW and GW, her husband, being waged in the children's presence. Two days later the county attorney for Johnson County filed a petition under W.S. 14-3-201 through 14-3-215 (July 1986 Repl.), alleging that the children were neglected and in need of supervision. On October 7, 1986, the district court held a hearing on the petition. At the hearing ZLW and GW admitted the children were neglected and in need of supervision. The district court ordered D-PASS to retain custody of the children, ZLW to have visitation with the children, and ZLW to attend substance abuse counseling and parenting classes.

The district court reviewed the matter again on May 5, 1987. As a result of that review, the district court ordered D–PASS to retain custody of the children and a subsequent hearing on the petition to determine whether D–PASS should retain custody of the children or whether ZLW was capable of taking care of them.

On October 26, 1987, the county attorney for Johnson County filed a petition to terminate ZLW's parental rights to her children. Following a two-day trial which began on January 12, 1988, the district court ordered that ZLW's parental rights to each of her four children be terminated.

## STANDARD OF REVIEW

In reviewing the sufficiency of the evidence presented at trial, we use the analysis we have consistently followed in cases of this kind. See, e.g., *In the Interest of JG*, 742 P.2d 770, 773 (Wyo.1987); *Matter of MLM*, 682 P.2d 982, 985–986 (Wyo.1984); *Matter of GP*, 679 P.2d 976, 980–982, 1005–1007 (Wyo.1984). Under this analysis we:

1. Give considerable deference to the trial court's determination because it has the advantage to judge the demeanor and intelligence of the witnesses;

2. Examine the evidence in the light most favorable to appellee and resolve all conflicts in evidence for appellee;

3. Assume as true the evidence in appellee's favor, disregard entirely appellant's evidence in conflict with appellee's evidence, and give to appellee's evidence every favorable inference that may fairly be drawn;

4. Exercise strict scrutiny in reviewing whether the evidence clearly and convincingly proves the elements of parental rights termination;

5. Define "abuse" as the nonaccidental inflicting or causing to be inflicted physical or mental injury, harm or imminent danger to the physical or mental health or welfare of a child. W.S. 14–3–202(a)(ii) (June 1986 Repl.);

6. Define "mental injury" as an injury to the psychological capacity or emotional stability of a child as evidenced by an observable or substantial impairment in that child's ability to function within a normal range of performance and behavior with due regard to that child's culture. W.S. 14–3–202(a)(ii)(A) (June 1986 Repl.)

7. Define "neglect" as the parent's failure or refusal to provide adequate care, maintenance, supervision, education or medical, surgical or any other care necessary for the child's well-being. W.S. 14–3–202(a)(vii) (June 1986 Repl.)

## ABUSE, NEGLECT, PHYSICAL AND MENTAL INJURY

▮ ZLW admitted at the October 7, 1986, hearing that she had neglected the children and that she had discussed putting them up for adoption. In addition to the documents signed by ZLW on July 13, 1987, purporting to relinquish her parental rights and consenting to their placement for adoption, the evidence clearly and convincingly shows ZLW was abusive to and neglected each of her four children over an extended period of time.

With reference to RJP, the evidence was:

1. When RJP was an infant in 1977, ZLW placed her in a foster home for about six months because ZLW, then nineteen years old, was having problems coping with the child.

2. RJP's teachers from kindergarten through fourth grade testified that until she was placed in foster care RJP frequently came to school unclean and inappropriately dressed in adult women's clothing. RJP was very angry, defiant, depressed and moody because of her home environment, and this emotional state was reflected in her inability to play with and make friends at school. She was unruly toward her classmates; she did not smile or respond to affection.

3. In kindergarten RJP was frequently absent from school, at one point having missed twenty-three of forty school days. The school nurse at RJP's school observed bruises and welts on RJP on several occasions. During class discussions RJP would tell her classmates that she, not her mother, had the responsibility to

get her brothers and sister up in the morning, fed, and off to school.

4. The first ten years of RJP's life were filled with visions of arguments, drunkenness and physical violence between ZLW and several different men.

5. During the 1987–1988 school year ZLW had not attended school conferences to discuss RJP's progress.

6. On September 22, 1986, when first placed in protective custody, RJP and the three other children were dirty, smelly and frightened.

7. Initially in foster care, RJP was a very troubled child, demonstrating anger, defiance, and fits of rage when she did not get her own way. She rarely smiled; she never cried. At first, RJP did not know to bathe daily, to brush her teeth daily or to have clean sheets. She was hungry and would hide food.

8. During foster care, RJP changed dramatically for the better. Now RJP smiles and laughs a great deal. She makes friends and interacts well with them and takes pride in her personal appearance. Her foster parent analogized the change in RJP to the difference between "night and day."

ZLW admitted she could not cope with RJP as the child was growing up. On at least one occasion ZLW grabbed RJP and threw her across the room on the floor after trying to spank her. ZLW reverted to RJP's age level and was locked in sibling rivalry with her, the sad result of which was an environment of continual bickering, arguments, physical and mental abuse, and neglect.

With reference to JSN, the evidence was:

1. In December, 1981, JSN received emergency hospital care for several bruises over his midsection, buttocks and legs. The physical evidence strongly indicated JSN had been sexually abused. ZLW had left JSN with babysitters and suspected they may have harmed her son.

2. JSN's teachers from kindergarten through second grade testified that until he was placed in foster care JSN frequently came to school inappropriately dressed and hungry. His behavior was characterized with displays of anger, crying, and temper tantrums many times a day. He did not play well with his classmates. ZLW had not attended school conferences during the 1987–1988 school year to discuss JSN's progress.

3. School teachers, the school nurse, and the summer program teacher all testified to seeing JSN wearing "badges of abuse" such as bruises on his legs and bruises and welts on his head. JSN said the bruises and welts were caused by GW beating him with a belt and hitting him while wearing a ring. ZLW says she, not others, inflicted this physical harm.

4. On occasion, as a disciplinary measure ZLW confined JSN to his bedroom for two weeks. He urinated in his pants and defecated in a diaper box while so confined.

5. Like his brother and sisters, when first placed in protective custody on the night of September 22, 1986, JSN was dirty, smelly, and frightened. As a result of his foster care, he is improving in his social development and academically, and responds positively to the love and affection given him in foster care.

With reference to VME and AJW, the evidence was:

1. Like RJP and JSN, when taken into protective custody on September 22, 1986, VME and AJW were dirty, smelly, and frightened. In foster care they were kept clean and their behavior improved.

2. On March, 9, 1987, VME and AJW were returned to ZLW; one month later ZLW returned them to foster care, stating she could not handle the children at that time.

3. Again, on June 4, 1987, VME and AJW were returned to ZLW. From June 9 through June 15, 1987, ZLW left the children with her mother while ZLW left town with her boyfriend.

4. On or about July 7, 1987, ZLW told John S. Noteboom, a social worker with D-PASS, that she was not cut out to be a mother and did not want the responsibility for these young children. During the

time period of ZLW's custody of VME and AJW, they attended a day care program. The day care teacher testified that VME and AJW came to day care dirty and smelly; she had to bathe them on about eight occasions. Their clothing was unkempt, smelly, and inappropriate for summer weather. The day care teacher described VME as a very tense child who frequently cried in her sleep at nap time. VME's interaction with day care classmates was characterized by VME's fits of anger, screaming, and yelling. AJW had an oozing ear infection requiring medical attention. Both VME and AJW ate many more food servings than the other children, evidencing their hunger. On several occasions when ZLW picked up VME and AJW at day care, ZLW smelled of alcohol.

5. On July 13, 1987, ZLW returned VME and AJW to D–PASS for foster care placement. In reply to Mr. Noteboom's discussing her reentry into psychotherapy with new intensity, she said she did not want to go through it. Instead, she discussed relinquishing her parental rights and consenting to placing all four of her children for adoption. She signed documents for this purpose. Although several weeks later she changed her mind about relinquishing parental rights, her visitations with her children from summer of 1987 until the hearing date in January, 1988, were hit and miss. Of 123 scheduled visitations, she missed seventy-three. She was late or returned the children early on another twenty-nine visits.

6. She was not with AJW when he underwent a surgical procedure in December, 1987, and did not visit with AJW's foster parent about the results of that procedure. ZLW did not attend AJW's birthday party held a few days before the trial in this matter.

7. VME's and AJW's foster parent was concerned about VME's vivid description of "french-kissing" and VME's and AJW's graphic play-demonstration of performing sexual intercourse. Similarly, their foster parent was concerned about VME's and AJW's frequent discussions and demonstrations of how GW used to beat up ZLW.

In light of our strict scrutiny review of the evidence presented by D–PASS and considered by the district court, we are satisfied that the evidence clearly and convincingly established that ZLW neglected and abused each of her four children. Having found overwhelming evidence of neglect and abuse, we next consider whether efforts by an authorized agency or mental health professionals have been successful in rehabilitating ZLW.

## REHABILITATION EFFORTS

■ William Clark, a social worker and mental health counselor for Northern Wyoming Mental Health Center in Sheridan, Wyoming, described ZLW as having a chronic histrionic personality disorder and an alcohol abuse problem. Her condition is characterized by "sudden changes in mood and affect," overreaction to daily events resulting in temper tantrums and "low level impulse control," and difficulty in forming and maintaining interpersonal relationships. Reed S. Morrill, Ph.D., family and child specialist at the same mental health center, agreed with that description. Dr. Morrill attributed ZLW's condition to her childhood experiences of parental neglect, abuse, and sexual molestation at the hands of her step-father.

ZLW's condition seriously interferes with her relationships with her children. She sees herself as a "victim" when her children make common daily demands on her as a parent, and she seeks out partners who will further victimize her. She does not function on a normal adult level when trying to control her anger. She has had a very difficult time overcoming the denial of her early victimization which has affected the choices she makes in her adult life. ZLW's primary means of socialization has been to go to bars several times a week to consume alcohol and socialize with bar patrons. On occasion when ZLW was working in a bar, ZLW brought the children into the bar with her for several hours. Characteristic of her condition, she has tended to resist counseling and psychotherapy;

her resistance and denial of problems seem over and above that attributable to her disorder. Appropriate treatment for ZLW would consist of intense psychotherapy counseling twice weekly over two years. Without successfully completing such intensive treatment, ZLW will probably continue to treat her children as she herself was treated as a child.

With this appreciation and understanding of ZLW's condition, D–PASS tried to rehabilitate her by planning and initiating parenting classes and counseling sessions for her. D–PASS urged her to attend a weekend intervention program for alcohol abuse. Although she made initial progress and some improvement was observed, ZLW ultimately failed at rehabilitation in large part because of her sporadic attendance at counseling sessions and parenting classes, her ambivalence in wanting to improve, her lack of desire to become involved in an alcohol support group, and her lack of desire to place her children's needs above her own.

Perhaps most telling is ZLW's own description of her attitude toward the rehabilitation efforts. When asked at trial if she was willing to continue with counseling as recommended by the alcohol abuse intervention program, she answered: "I would and I wouldn't. * * * I guess it would be like trying to fit it into the schedule and still have time for other things."

In the opinion of her counselors Mr. Noteboom, Mr. Clark, and Dr. Morrill, ZLW's rehabilitation efforts have been unsuccessful.

Considering the evidence presented by D–PASS and considered by the district court, we are satisfied that the evidence clearly and convincingly established that the appropriate rehabilitation efforts on ZLW's behalf failed.

## CHILDREN'S HEALTH AND SAFETY

■ Finally, we consider whether the children's health and safety would be seriously jeopardized by returning them to ZLW. Mr. Clark testified that, based upon his expertise and experience with ZLW, he was concerned about ZLW's ability to control her impulses. He believes she would harm the children when she lost control, and he believes ZLW is still likely to become involved with men whom she will allow to victimize her. He worries about what might happen to the children because of ZLW's poor choice of men partners, both in terms of the mental harm to the children in witnessing the victimization of their mother and the physical harm to the children at the hands of such men. Dr. Morrill, based upon his expertise and experience with ZLW, shares Mr. Clark's opinion.

Bruce L. Andrews, a family and child therapist at Northern Wyoming Mental Health Center in Sheridan, Wyoming, based upon his expertise and experience with JSN, testified that a very volatile or dangerous situation would exist if the children were returned to ZLW, particularly with regard to RJP and JSN. He would expect to see harmful confrontations between ZLW and RJP. In his view, ZLW is so emotionally involved in defending herself, she would find it difficult to protect her children from her men friends or from her own anger resulting from her frustrations created by her children's needs. According to Mr. Andrews, these children have had a lifetime of "dysfunctional role modeling," and if it continues, the result will be a "protracted dysfunctional learning period" for all the children. Mrs. Lynn Y. Carroll, also a family and child therapist at the mental health center, agreed with Mr. Andrews. In light of her expertise and experience with RJP, Mrs. Carroll is concerned about RJP's safety if she were to be returned to ZLW. She stated that RJP is pretty and attractive and would be very vulnerable in view of ZLW's demonstrated pattern of associating with unstable men. In Mrs. Carroll's opinion, these children have suffered serious developmental delays which would continue if they returned to ZLW.

We conclude that the testimony provides clear and convincing evidence in support of the district court's finding that the children's health and safety would be seriously jeopardized by their return to ZLW.

As a result of our strict scrutiny in reviewing the evidence considered by the district court in its application of the relevant provisions of the parental-rights termination statute, we hold the evidence clearly and convincingly established that the state's compelling interest in protecting the welfare of these four children can be met only by terminating ZLW's parental rights to each child.

The judgment of the district court is affirmed.

URBIGKIT, J., files a specially concurring opinion.

URBIGKIT, Justice, specially concurring.

I concur with the decision of this court, but write further to consider the fundamental principles involved. The familial right of both the parent and child is a fundamental liberty interest protected by state and federal constitutions. *DS and RS v. Department of Public Assistance & Social Services,* 607 P.2d 911 (Wyo.1980). Of countervailing interest in societal concern is the more demanding decision to define and protect the best interest of the child. *In the Interest of JL,* 761 P.2d 985 (Wyo.1988).

This court has said "that the best-interest language must be read in para materia with the abuse, neglect or abandonment standard." And then said: "This means, for example, that if the State seeks to terminate parental rights because of neglect, the State must show that the interests of the child require termination of the parental rights in order to protect the child from neglect." *DS and RS,* 607 P.2d at 917. This is also the reason that efforts at rehabilitation and its failure becomes a significant "best interest" inquiry in termination hearing. *In Interest of J.G.,* 742 P.2d 770 (Wyo.1987). Evidence of abuse is a subject subsumed within the best interest determination as the basic decision to be made by the court. *TR v. Washakie County Dept. of Public Assistance and Social Services,* 736 P.2d 712 (Wyo.1987).

In the detail of this unhappy family experience, the best interest of the child standard clearly and persuasively justified termination. *In the Interest of JL,* 761 P.2d 985 (Wyo.1988); *Matter of MLM,* 682 P.2d 982 (Wyo.1984).