### In re ADOPTION OF MM a/k/a NLM, a minor.

### SKMD, Appellant (Objector-Respondent),

### v.

### SLM and LKM, Appellees (Petitioners).

### No. C–13.

Supreme Court of Wyoming.

Oct. 28, 1982.

Sue Davidson of Urbigkit & Whitehead, P.C., Cheyenne, signed the brief and appeared in oral argument on behalf of appellant.

No appearance on behalf of appellees.

Before ROSE, C.J., RAPER, THOMAS and ROONEY, JJ., and O'BRIEN, District Judge.

RAPER, Justice.

This is an appeal by the natural mother, appellant (SKMD) of the child, MM, also known as NLM (NLM), from a Decree of Adoption by which appellees (SLM and LKM), became the adoptive parents. SKMD states as issues:

"1.  Did the Trial Court err in failing to give full faith and credit to the applicable and controlling New York adoption law in derogation of the Constitutions of the State of Wyoming and of the United States of America?

"2.  Did the Trial Court err in failing to give full faith and credit to the Interstate Compact on the Placement of Children of New York or in failing to apply the Interstate Compact on the Placement of Children of Wyoming?

"3.  Did the Trial Court err in failing to return legal and physical custody of the minor child to her natural mother?"

We will affirm.

There is no substantial dispute about the facts incorporated into the decree of adoption.  Briefly summarized, SKMD, in March or April, 1980, became pregnant while a member of the United States Navy,

stationed at Guantanomo Bay, Cuba. In July, 1980, she was transferred to the naval base at Norfolk, Virginia. While there, she expressed to her superior a desire to relinquish the baby for adoption when born. He conveyed that information by letter to his friends SLM and LKM, husband and wife who were Wyoming residents. SLM and SKMD made contact with each other. SKMD orally agreed at that time to give the child to SLM and her husband, and they agreed to pay the costs and expenses of the birth.

SKMD was discharged from the Navy[1] and moved to New York City to live with a male friend (D), whom she had met while in the Navy. (They were married shortly before the initial hearing.) SKMD at that time maintained that D was not the father of the unborn child and she did not know the name of the child's father.

After several long-distance conversations about the adoption, SKMD asked SLM and LKM to have legal documentation prepared to assure her that they would adopt the child and pay the expenses. They contacted a New York attorney who advised them to hire a Wyoming attorney since Wyoming would become the child's domicile and the adoption proceedings would be conducted in Wyoming courts. As a result, various documents were prepared in Wyoming and sent to SKMD's doctor at her request: a contract whereby the mother consented to the adoption and the adopting parents agreed to pay medical expenses; an affidavit in which the mother consented to the adoption and stated the father was unknown[2]; and, a promissory note made by SKDM payable to SLM and LKM to secure the advanced payment of medical expenses in the sum of $2,300 in the event the mother changed her mind *before* the child was handed over to SLM and LKM. These were all executed by the parties. The agreement and separate affidavit of consent were made under oath and acknowledged. SKMD executed the documents on November 22, 1980, after consulting with her doctor and D and after an opportunity to consult with an attorney; it does not appear that she sought the advice of legal counsel until after custody of the baby was relinquished.

On January 5, 1981, the girl child was born and the adopting parents notified. They traveled to New York City where, in the hospital and in the presence of the hospital administrator and D, the infant was delivered by SKMD to SLM and LKM on January 8, 1981. The adoptive parents, with the child, returned to their residence in Kemmerer, Wyoming.

On January 14, 1981, SKMD, through her attorney, sent notice to SLM and LKM demanding return of the child to her and declaring that her previous consent to adoption was revoked. SLM and LKM petitioned the Wyoming district court of the district wherein they resided for adoption of NLM on January 16, 1981. They have continuously resisted revocation of the consent.

On February 9, 1981, the Director of the Wyoming Lincoln County Department of Public Assistance and Social Services was ordered by the district judge to conduct a home study of the petitioners for adoption. He, as well, requested New York authorities to conduct a like study of SKMD's home. On the same date an attorney guardian ad litem was appointed to represent the best interests of the child. On February 11, 1981, objection to adoption was filed in the proceeding by the natural mother and D, who at that time, by attached affidavit, alleged he was the putative father.[3] In answers to interrogatories, SKMD acknowledged having sexual intercourse with someone other than D during

---

1. We are given to understand that if SKMD had elected to remain in the United States Navy, the expenses of the birth would have been taken care of by the United States.

2. A birth certificate appearing in the record, issued on the date of the child's birth, is blank as to the name of the father and associated information as to his age and birthplace. See fn. 3, infra.

3. There appears in the record a second birth certificate issued May 5, 1981, based on a report filed January 14, 1981, in which D is shown as the father. See fn. 2.

the time when conception could have occurred. Blood tests indicated the odds of D being the father were 0 to 1. It was eventually stipulated that D was not the father of the child and his objection to the adoption was not an issue.

At the hearing prior to entry of an Interlocutory Decree of Adoption by the district court, the natural mother testified that S, a member of the United States Marines was the father. He was served notice of the hearing set on an application for a final decree of adoption but defaulted. SKMD petitioned for a new hearing following entry on December 15, 1981 of a final Decree of Adoption. Among the grounds therefor, it was alleged that new evidence indicated that one Monty was the father of the child and should have been given notice. Monty furnished an affidavit to the effect that he had sexual relations with SKMD during the period when the child was conceived. SKMD's affidavit stated that she had named S with his consent instead of Monty in order to protect Monty because Monty had just gone through a bad divorce experience.

In the light of the possibility of a new father having been discovered, and questionable notice to the natural mother of a hearing prior to entry of the December 15, 1981 final Decree of Adoption, the trial judge directed service of notice on Monty and fixed a further hearing date. Monty defaulted. The trial judge thereafter entered a new final Decree of Adoption on May 20, 1982. It is from that decree that this appeal has been taken.[4] The Decree of Adoption now appealed from is uniquely exhaustive in its findings of fact and conclusions of law—covering some 21 pages of legal size paper. The trial judge took particular care in not only the decree, but also in open court to record his observations of the demeanor of the parties and witnesses, along with their credibility as related to the best interests of the child to bolster the testimony which is ordinarily all we have

before us. He feared that we would not see those reflections from the transcript. He found (1) the consent was regular in every respect; (2) there was no duress in obtaining it; (3) there is no known father; and (4) it is in the best interest and welfare of NLM that the petition for adoption by SLM and LKM be allowed and a decree of adoption granted.

SKMD does not in this appeal challenge the findings of fact. She elects to stand on issues involving only questions of law.

We understand, as did the trial jurist, that a contested adoption matter is emotionally charged and sparked by persuasive conflicting philosophies which must be brought into equalibrium. While this case is one of first impression for us, the supreme court has had before it a case involving a non-consenting parent in an atmosphere compounded by divorce, *In the Matter of Adoption of Voss,* Wyo., 550 P.2d 481 (1976). Therein the caution with which courts guard the parent-child relationship was explained to be based upon the postulate that:

"* * * [T]he earliest and most hallowed of the ties that bind humanity, in all countries considered sacred, is the relationship of parent and child. Therefore, parents have the first and natural right to their children. A decree of adoption tears asunder forever the parent-child relationship and for all legal and practical purposes, that child is the same as dead to the parent affected. The parent has lost the right to ever again see the child or even know of his whereabouts. * * *" 550 P.2d at 485.

We again in a termination of parental rights appeal showed compassion for the natural mother-child relationship in our decision in *DS and RS v. Department of Public Assistance and Social Services,* Wyo., 607 P.2d 911 (1980).

On the other hand, there are the childless who yearn for the opportunity to parent children. This court observed in *In the*

---

4. Two previous appeals to this court were attempted by appellant, one from the interlocutory decree, which we dismissed as not a final judgment and the other an appeal from an award of fees to the guardian ad litem which was dismissed as untimely.

*Matter of the Adoption of Voss,* supra, that there is splendor in adoption of children in appropriate cases. It affords in so many instances a future in every respect which a child may not otherwise enjoy. It fills a void for those not blessed as natural parents and those others who also have the capability and overwhelming desire to care for and raise the helpless. They, too, must not be deprived when they take a lawful, sincere, caring, and good faith course, especially when they have been committed to and are willing to assume or have assumed parental responsibilities.

■ The legislature has recognized irrevocable consent as a meaningful device through which such a commitment may be made secure. This is a matter of public policy which is the business of the legislature. In its general sense, public policy refers to the law of a state embodied in its constitution, statutes and judicial decisions. When the constitution and statutes have not spoken on a subject, public policy refers to a principle of law that holds no one can lawfully do that which has a tendency to be injurious to the public or against the public good. Here, however, we have a statute which, from our decision, cannot by definition be contrary to public policy—it is public policy. *Higgins v. Nationwide Mutual Insurance Company,* 50 Ala.App. 691, 282 So.2d 295, 298 (1973); *Dairyland County Mutual Insurance Company v. Wallgren,* Tex.Civ.App., 477 S.W.2d 341, 342 (1972); *Craemer v. Superior Court In and For County of Marin,* 265 Cal.App.2d 216, 71 Cal.Rptr. 193, 199 (1968); *In Re Barnes' Estate,* 256 Iowa 1043, 128 N.W.2d 188, 192 (1964).

As previously said, this court has never struggled with this particularly sensitive adoption problem which so fundamentally alters lives. Any person may be adopted who is within this state when the petition for adoption is filed. Section 1–22–102, W.S.1977. Any adult person residing in Wyoming and found by the court to be fit and competent to be a parent may adopt. Section 1–22–103, W.S.1977. Consent is required and must be signed by the child's

parents; the mother alone may sign if the name of the father is unknown, but she must make an affidavit to that effect. Section 1–22–109(a)(iv), W.S.1977. Consent to adoption and the relinquishment of the child for adoption are irrevocable unless obtained by fraud or duress; the only exception is that if a Wyoming court denies the adoption because the putative father does not consent, the court may allow the mother to withdraw her consent and relinquishment. Section 1–22–109, W.S.1977. After the petition to adopt has been filed and a hearing held, the court, acting in the best interest and welfare of the child, may enter an interlocutory decree of adoption giving the care and custody of the child to the petitioners until further order of the court, § 1–22–111(a)(i), W.S.1977; after the child has been in the home of the petitioners for six months and an interlocutory decree of adoption has been entered, petitioners may apply for a final decree of adoption and a hearing may be required on the petition. Section 1–22–112, W.S.1977.

■ This court has spoken on the subject of duress. Duress exists whenever one, by the unlawful act of another, is induced to perform some act under circumstances which deprive him of the exercise of free will. *In the Matter of Adoption of D.P. and F.P.,* Wyo., 583 P.2d 706 (1978). See also, Annot., What Constitutes "Duress" in Obtaining Parent's Consent to Adoption of Child or Surrender of Child to Adoption Agency, 74 A.L.R.3d 527 (1976), wherein it is said to be the general rule that where the natural parent has executed the consent after having been given an opportunity to deliberate and reflect on the decision and to seek independent advice and counseling and to ponder the alternatives available to her, duress does not exist.

■ The matter of statutory requirements for adoption and the law of duress are only discussed as we have for the reason that these subjects demonstrate the state of the jurisprudence of Wyoming showing the care and caution which must be applied to adoption matters. We consider an understanding of Wyoming requirements neces-

sary to an adequate discussion of the conflict-of-laws questions. Adoption was unknown in the common law; and, therefore, adoption statutes are to be strictly construed. *In the Matter of Adoption of Voss,* supra; *In re Cadwell's Estate,* 26 Wyo. 412, 186 P. 499 (1920).

SKMD asserts that New York law must be applied because "[t]he State of Wyoming is an inseparable part of the federal union, and the constitution of the United States is the supreme law of the land," Article 1, § 37, Wyoming Constitution; and therefore we are bound by Article 4, § 1, United States Constitution, requiring that "[f]ull Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State."

█ SKMD asserts that the contract here requires us to apply the law of New York. We do not want to spend too much time on the agreement to adopt. All of the elements necessary to a valid contract are present: offer, acceptance, and consideration. The contract has been performed. The hospital bills were paid as agreed and the child was delivered as agreed. The contract is really not required in Wyoming for a valid adoption. A child is not in any sense of the word like a horse, a cow or chattel. *In re Adoption of Hiatt,* 69 Wyo. 373, 242 P.2d 214 (1952). A child is not sold. The only important document that is required as far as this case is concerned is the consent and, when coupled with physical relinquishment by the natural mother to the adoptive parents, the consent is consummated. When consent is given in writing in the form of an affidavit when the putative father is unknown and the child relinquished, it is irrevocable except for duress or fraud, § 1–22–109, supra. The written consent is recognized as a meaningful document intended to be given effect. It must not be easily set aside. The contract was unnecessary and was only furnished in this instance because requested by the mother for some assurance that her medical expenses would be paid. We, therefore, refrain from applying contract law.

SKMD then contends that the New York Law of Consent to Adoption must be followed. Section 115–b, Domestic Relations Law, 14 McKinney's Consolidated Laws of New York, Annotated, provides that "[i]f a duly executed and acknowledged consent to a private placement adoption shall so recite," it shall not be revoked by the consenting parent, if executed before "a judge or surrogate of the court in which the adoption proceeding is to be commenced." If not so executed and acknowledged, "if it so state[s]" it will become irrevocable thirty days after commencement of adoption proceedings "unless written notice of revocation" is received by the court in which the adoption proceeding is to commence within thirty days. Then follow various procedural requirements, including a hearing if the matter becomes contested at which the court shall "take proof as to whether the best interests of the child will be promoted by the return of the child to the parents, or by the adoption of the child by the adoptive parents." If the court decides that the best interests of the child will be served by adoption by the adoptive parents, then the notice of revocation is of no force and effect. The procedure does not bar proceedings on the ground that the consent was obtained by "fraud, duress or coercion."

Substantively speaking, the New York statute is very similar to the Wyoming provisions on the subject with the only procedurally significant difference being in the law governing revocation of consent; Wyoming allows revocation of consent only upon proof of fraud or duress, § 1–22–109(d), supra, where New York seems to provide an additional procedure which allows the possibility of revocation if written notice of revocation is filed within thirty days of commencement of adoption proceedings, § 115–b, supra. The timely filing of notice of revocation in New York does not guarantee that the attempt to revoke consent will be successful, it merely forces the courts to make further inquiries before deciding whether a decree of adoption should be granted. Although not a basis for our decision, we note that the district court, to its credit, went to great lengths to

determine what was best for the child in reaching its decision; we doubt that the New York procedure would have afforded any more careful review of the factors involved. If the child were adopted in the courts of the state of New York, there is however the likelihood that the procedures set out in § 115–b, supra, would be required.

Although we have acknowledged that a conflict in the adoption laws of Wyoming and New York exists, we must determine whether both states have a significant interest in the matter before turning to conflict-of-laws jurisprudence to decide the case. It cannot be doubted that Wyoming has a significant interest since it is the domicile of the child and adoptive parents, as well as the location of the forum chosen to decide the matter. Therefore, if we decide New York has no interest in the matter, unquestionably no conflict exists and Wyoming law must apply. We do not so hold. New York, as the domicile of the mother and birth place of the child, has an interest in this adoption matter; therefore, we must turn to conflict-of-laws jurisprudence to decide this case.

█ We need go no further than the Restatement of the Law. Section 78 and Comment a, Restatement, Conflict of Laws 2d:

"A state has power to exercise judicial jurisdiction to grant an adoption if

"(a) it is the state of domicil of either the adopted child or the adoptive parent, and

"(b) the adoptive parent and either the adopted child or the person having legal custody of the child are subject to its personal jurisdiction.

"Comment:

"a. *Rationale.* The interests of the child and of his natural and adoptive parents are affected by an adoption. When all of these persons are domiciled in a single state, this state clearly has judicial jurisdiction to determine whether an adoption should be decreed. But if jurisdiction

were confined to such cases, it would be impossible for a person to adopt a child who is domiciled in another state. This would be undesirable. When the child and the adoptive parent are domiciled in different states, an adoption may be granted in either state provided that the court has personal jurisdiction over both parties, or, when this is lacking in the case of the child, if the state has personal jurisdiction over the person who has legal custody of the child.

"Important questions involved in an adoption proceeding are whether adoption would be in the child's best interests, and, if so, whether the would-be adopter is a desirable person from the child's point of view. Courts sitting in either the state of domicil of the child or in that of the adoptive parent will normally be equally well situated to determine such issues. And the interests of the two states in the matter are of approximately equal weight."

Under this rule, the district courts of Wyoming have jurisdiction and provide a proper forum to hear the case. The question, then, is which state's law should be applied. That is answered by § 289 and Comments a and b, Restatement, Conflict of Laws 2d:

"A court applies its own local law in determining whether to grant an adoption.

"Comment:

"a. This rule is mitigated by the fact that under the local law of at least the great majority of states the welfare of the child is the most important factor that the court should consider in determining whether to grant an adoption.

"b. As to the circumstances in which a state has judicial jurisdiction to grant an adoption, see § 78."

The interests of Wyoming and the state of New York are as we can see, compatible in every respect, particularly with regard to the welfare of the child as being the most important factor.[5] *In the Matter of*

5. SKMD relies strongly on *Dennis T. v. Joseph C.,* 82 A.D.2d 125, 441 N.Y.S.2d 476 (1981).

This case holds that where § 115–b, New York Domestic Relations Law, supra, is not followed,

*Adoption of D.P. and F.P.,* supra. The courts of Wyoming and New York are equally qualified to make this determination. But, since the child is domiciled in the state of Wyoming and the action was brought in Wyoming, that is the state which has the greatest interest in and the most intimate contact with her welfare, founded upon genuine humanitarian considerations, and should properly apply its law.

We hold that the Wyoming district court had jurisdiction and the statutory law of Wyoming substantively and procedurally must be followed. We further hold that the trial judge followed the Wyoming law in every respect.

█ We finally consider the Interstate Compact on Placement of Children, § 14–5–101 et seq., W.S.1977 and § 374–a, New York Social Services Law, McKinney's Consolidated Laws of New York, Annotated. As pointed out by SKMD, the Wyoming and New York forms are substantially identical. We agree with the trial judge that it is inapplicable. The terminology lacks cohesion with and is not adaptable to an adoption arranged privately between the consenting natural parent and the adopting parents. We find nothing in the adoption laws of Wyoming which refers to the custody by adopting parents as a "placement." Placement is defined in the compact, § 14–5–101, I(d):

> "(d) 'Placement' means the arrangement for the care of a child in a family free or boarding home or in a child-caring agency or institution but does not include any institution caring for the mentally ill, mentally defective or epileptic or any institution primarily educational in character, or a hospital or other medical facility."

While reference in § 14–5–101, II(a) of the compact is made to "placement in foster care or as a preliminary to a possible adoption," that does not fit into the circumstances here, where the natural parent delivered the child to the adopting parents

under a consent affidavit which stated that she "does hereby give her consent to the adoption" of her child. There was no "placement" *preliminary* to a *"possible"* adoption. There was relinquishment for adoption, a positive, not potential act.

Section 14–5–101, III provides as a penalty for violation that "[s]uch violation may be punished or subjected to penalty in either jurisdiction in accordance with its laws." Additionally, provision is made for suspending the "license, permit, or other legal authorization held by the sending agency which empowers or allows it to place, or care for children." The penalty in Wyoming is a misdemeanor with a fine of $100 and/or imprisonment for a maximum of thirty days for each day of violation. The probability of there being elements of a crime present is remote. It is hardly possible that a natural parent needs a license or a permit to have a child and give her consent to adoption. It would seem that if it can be conceived that she is a sending agency under the compact, there is no permit to be suspended.

█ There is no provision in the adoption laws requiring compliance with the compact before a decree of adoption can be sought or entered. We just simply cannot find nexus between the circumstances here and the compact. There is no legislative intent present which makes the compact pari materia with the statutory law of adoption. Such intent is necessary. *Sanches v. Sanches,* Wyo., 626 P.2d 61 (1981). It is our view that the compact is applicable only to those engaged in the governmental or private service of placing children for care. Intent must be ascertained whenever possible from the language of the statute. *Department of Revenue and Taxation v. Irvine,* Wyo., 589 P.2d 1295 (1979).

We hold the compact inapplicable.

Affirmed.

---

then the natural mother's common law right to her child prevails in the absence of unfitness. We do not make any attempt to decide what

we would do if the consent statutes of Wyoming had not been followed because they were.