In the Matter of the Parental Rights to
TR and JS, a/k/a JTS, minor children.

PR, a/k/a PS, Appellant (Respondent),

v.

Charles W. SHANNON, Director of the
Big Horn County Office of Public As-
sistance and Social Services, Appellee
(Petitioner).

No. C–88–10.

Supreme Court of Wyoming.

July 21, 1989.

John W. Davis of Davis, Donnell, Worrall & Bancroft, P.C., Worland, for appellant.

Joseph B. Meyer, Atty. Gen., Peter J. Mulvaney, Deputy Atty. Gen., and Richard E. Dixon, Asst. Atty. Gen., for appellee.

Before THOMAS, URBIGKIT, MACY and GOLDEN, JJ., and RAPER, J. (RET.).

MACY, Justice.

This case is before the Court for a second time. In the prior appeal, *P.R. v. Shannon*, 726 P.2d 500 (Wyo.1986), we reversed and remanded a decision terminating the parental rights of PR, due to the failure to appoint a guardian *ad litem* to represent the best interests of the minor children in the termination proceeding. The instant appeal is from an order of the district court which, upon the motion of the State of Wyoming, Division of Public Assistance and Social Services, dismissed the petition for termination of parental rights but upheld the validity of relinquishments of custody and consents for adoption previously executed by appellant PR in relation to her minor children, TR and JS. In resolving the issues presented in this appeal, we must examine the validity of the relinquishments and consents for adoption, including the effect of appellant's attempted revocation thereof, and determine whether the procedural mechanisms involved in this case were sufficient to free these children for adoption.

We affirm.

Appellant presents these issues:

1. [WHETHER] THE TRIAL COURT ERRED WHEN IT APPLIED AN IMPROPER STANDARD TO DETERMINE WHETHER OR NOT A RELINQUISHMENT OF PARENTAL RIGHTS WAS VALID.

2. [WHETHER] THE TRIAL COURT ERRED WHEN IT FAILED TO APPLY THE FACTS DEVELOPED TO THE PROPER STANDARD.

The Big Horn County Department of Public Assistance and Social Services (DPASS) first became involved with appellant in 1976 or 1977 when it arranged for her placement in the Job Corps. In 1981, while unmarried and pregnant with TR, appellant was referred to DPASS by a physician who was concerned about her ability to adequately care for the child. DPASS unsuccessfully attempted to persuade ap-

pellant to relinquish the baby for adoption. TR was born in October of 1981. Appellant did not marry TR's father. Thereafter, DPASS provided various services to appellant, primarily involving public assistance benefits. Appellant subsequently married, and a second child, JS, was born in early 1983.[1] In September 1983, DPASS received a child abuse complaint regarding TR, and from that point forward DPASS became actively involved in attempting to improve appellant's parenting skills in order that she could properly care for her children.

Efforts by DPASS to improve appellant's abilities as a parent and to protect the children included parenting classes, mental health counseling, protective day care, and temporary foster care for the children. These efforts were largely unsuccessful, however, as continued incidents of neglect and complaints of abuse were documented. Beginning in the fall of 1984, as a result of the continuing problems, appellant's DPASS caseworker began discussing with appellant the possibility or option of relinquishing her children for adoption. In October of 1984, appellant was not willing to relinquish her children for adoption but she did agree to a voluntary thirty-day foster placement for them. In the ensuing months, appellant's mental health counselor also discussed with her the possibility of relinquishing her children for adoption.

As further incidents and complaints of neglect and abuse occurred, it became apparent to the agencies involved that efforts on behalf of appellant and her children were not succeeding and that more drastic measures might be needed. These concerns were communicated to appellant. Finally, during a counseling session with her mental health counselor on May 24, 1985, appellant declared she was ready to relinquish the children for adoption. Her mental health counselor telephoned the caseworker, informed her of appellant's decision, and then transported appellant to the DPASS office where appellant executed relinquishment and consent for adoption documents for both children in the presence of her mental health counselor, the caseworker, and a notary public. Physical relinquishment of the children occurred later that day.

A few days later, appellant called the DPASS office and indicated she wished to revoke the relinquishments, and this telephone call was followed by a letter to the same effect dated June 4, 1985. In her telephone call and letter, appellant indicated that she had not fully understood the consequences of relinquishment and that she wanted her brother and sister-in-law in Alaska to adopt the children.

In an action apparently reflecting some uncertainty regarding the validity of the relinquishments and consents for adoption, DPASS filed a petition on June 28, 1985, seeking termination of appellant's parental rights and those rights of the children's fathers. Following a hearing held February 4 and 5, 1986, the district court entered its order terminating appellant's parental rights on the basis of neglect and failure of efforts to rehabilitate pursuant to Wyo. Stat. § 14–2–309(a)(iii) (1977). The district court also terminated the parental rights of TR's father by default on the basis of his election, as communicated to the court by his appointed counsel, not to appear and contest. JS' father had been dismissed from the termination action pursuant to his motion to dismiss, presented at the close of the State's case, upon the district court's finding that the State had failed to present clear and convincing evidence that he was unfit to have custody of JS. As previously mentioned, the termination decision was overturned by this Court on the procedural ground that a guardian *ad litem* had not been appointed to represent the interests of the children as required in termination proceedings by this Court's decision in *DB v. MM*, 617 P.2d 1078 (Wyo.1980), and by Wyo.Stat. § 14–3–211(a) (1977).[2]

---

1. In late 1983 or early 1984, appellant's husband was sentenced to the Wyoming State Penitentiary upon a conviction for a sexual assault not involving appellant or her children.

2. More precisely, the defect in the original proceeding was the failure to provide counsel to represent the children's best interests in the termination proceeding, as in fact DPASS had

Mandate on reversal issued from this Court on October 28, 1986. On November 17, 1986, the State/DPASS filed a motion to dismiss the termination proceedings on the ground that the voluntary relinquishments and consents to adoption had effectively extinguished appellant's parental rights, thereby rendering termination proceedings unnecessary. The State also noted in this motion that JS' father had executed a relinquishment with respect to JS since the original hearing. Appellant resisted the motion to dismiss, indicating to the district court that she should have a forum in which to challenge the validity of the consents. An attorney was appointed as guardian *ad litem* for the children. Thereafter, upon the stipulation of the parties, the district court allowed appellant to amend her answer to the original termination petition by adding a counterclaim for declaratory relief regarding the validity of the relinquishments. The district court's September 25, 1987, order granting appellant leave to amend her answer effectively provided for a bifurcated hearing in which the validity of the relinquishments would be considered as a threshold matter.

The matter was heard on January 6 and 7, 1988, and the district court, in its subsequent decision letter and order, found the relinquishments and consents to adoption executed by appellant to be valid and binding. The termination proceedings, consequently, were dismissed. This appeal followed. This Court, upon its own motion, noted that the order appealed from did not dispose of the claims relating to the two fathers and remanded for entry of a final order with respect to those claims. Accordingly, the district court entered an order indicating that the parental rights of the fathers had previously been resolved. The district court noted that JS' father had signed a voluntary relinquishment with respect to JS and that the parental rights of TR's father to TR were terminated by the original order in this case, from which he did not appeal.

been appointed as guardian *ad litem* for the children. The opinion in the earlier appeal, *P.R.,* 726 P.2d 500, does not make this distinction entirely clear.

Appellant's primary contention in this appeal is that the district court applied an improper standard in determining whether or not the relinquishments executed by appellant were valid. We cannot agree.

We first observe that this action is predicated on the Wyoming adoption statutes, Wyo.Stat. §§ 1–22–101 to –116 (1977), and not on the termination of parental rights statutes, Wyo.Stat. §§ 14–2–308 to –319 (1977). In *PAA v. Doe,* 702 P.2d 1259 (Wyo.1985), we observed that the adoption statutes and termination statutes do not serve identical purposes and, therefore, they are subject to different standards. We have also stated that "consent lies at the foundation of statutes of adoption and that the first duty of the judge is to see that all necessary consents are given." *MVF v. MF,* 766 P.2d 550, 552 (Wyo.1988).

As it existed in relation to this case, § 1–22–109, entitled "Consent to adoption," provided: [3]

(a) A written relinquishment of the child and written consent to adoption shall be filed with the petition to adopt and shall be signed by:

(i) Both parents, if living; or

(ii) The surviving parent; or

(iii) The mother and putative father of the child if the name of the putative father is known; or

(iv) The mother alone if she does not know the name of the putative father, in which case she shall sign and file an affidavit so stating; or

(v) The legal guardian of the person of the child if neither parent is living or if parental rights have been judicially terminated; or

(vi) The executive head of the agency to whom the child has been relinquished for adoption, or the state board of charities and reform if the child has been committed to the Wyoming state children's home and has been maintained by or in said home for

3. Section 1–22–109 was amended in both 1986 and 1987. This case arose prior to these amendments.

a period of one (1) year prior to the filing of the petition for adoption; or

(vii) The person having exclusive legal custody of the child by court order; or

(viii) The legally appointed guardian of any parent or putative father who has been adjudged mentally incompetent.

(b) If the child to be adopted is over the age of fourteen (14) years his written consent to adoption shall also be filed with the petition to adopt.

(c) The consent may be signed at any time and shall be acknowledged before a notary public, an officer authorized to take acknowledgments, or by a representative of the division of public assistance and social services within the department of health and social services or of a certified agency to whom the child is being relinquished for adoption, or a consent may be approved by the court after the person giving his consent has appeared before the court in an informal hearing in court chambers and if the court finds that the consent is knowingly and voluntarily given.

(d) *Consent to adoption and the relinquishment of a child for adoption are irrevocable unless obtained by fraud or duress,* except that if the court should deny the adoption on account of a claim or objection of the putative father of the child, the court may also allow the mother of the child to withdraw her consent and relinquishment. The consent or relinquishment by a parent who is a minor is valid and may not be revoked solely because of minority.

(Emphasis added.)

The question before us is whether the consents executed by appellant are valid. Appellant's challenge to the validity of the consents focuses on subsection (d) of the statute regarding revocability of consents. Appellant contends that the district court improperly limited its consideration of the grounds for revocation of consent to fraud and duress and erroneously failed to consider undue influence. We observe, however, that the district court in fact did address and reject appellant's claim of undue influence, although it did so after indicating doubt as to whether such consideration was required under the statute. The State, on the other hand, persuasively argues that courts are not free to graft a new standard onto the statute and thus consideration of undue influence was unnecessary and improper.

▉▉▉ Adoption was unknown at common law, and adoption statutes are subject to strict construction. *MVF,* 766 P.2d at 552; *SKMD v. SLM,* 652 P.2d 974 (Wyo. 1982). Additionally, since adoption is entirely statutory, the proceedings must be conducted in substantial conformity with the statutory provisions. *MVF,* 766 P.2d at 552; *Lucas v. Strauser,* 65 Wyo. 98, 196 P.2d 862 (1948). In *SKMD,* 652 P.2d at 978, we noted that the legislature, as a matter of public policy, provided that relinquishment of a child for adoption and consent to adoption are irrevocable, unless obtained by fraud or duress. We further noted in that case that written consent is recognized as a meaningful document which is intended to be given effect and which must not be easily set aside. *Id.* at 979.

This Court has said that duress exists "whenever one, by the unlawful act of another, is induced to perform some act under circumstances which deprive him of the exercise of free will." *Id.* at 978. *See also In re Adoption of D.P.,* 583 P.2d 706 (Wyo. 1978), and Annotation, *What Constitutes "Duress" in Obtaining Parent's Consent to Adoption of Child or Surrender of Child to Adoption Agency,* 74 A.L.R.3d 527 (1976). In *SKMD,* we cited the above annotation for

> the general rule that where the natural parent has executed the consent after having been given an opportunity to deliberate and reflect on the decision and to seek independent advice and counseling and to ponder the alternatives available to her, duress does not exist.

652 P.2d at 978.

▉▉▉ We recognize, however, that, although duress usually requires wrongful circumstances, some courts have expanded

the meaning of duress to include "force of circumstances" and "undue influence." *See* Annotation, *supra*, 74 A.L.R.3d at 530, and H. Clark, *The Law of Domestic Relations in the United States* § 21.5 at 621 (2d ed. 1987). Indeed, this Court discussed "undue influence" in *In re Adoption of D.P.*, 583 P.2d at 708. We are not inclined, nevertheless, to expand the grounds upon which a revocation of consent to adoption may be premised. This is an area particularly within the province of the legislature. As the State correctly points out, the legislature, in recent enactments, has specifically employed the term "undue influence" in other contexts. See Wyo.Stat. § 2–6–114 (1977) regarding self-proving wills and Wyo.Stat. § 35–20–102(a)(ix) (1977) where, within the chapter on adult protective services, the legislature defines "exploitation" in relation to disabled adults as taking advantage of by, *inter alia*, "undue influence" or "duress." We agree with the State that these statutes indicate that the legislature regards the terms as separate and distinct. Additionally, in *Voss v. Ralston*, 550 P.2d 481, 485 (Wyo.1976), we noted the following pertinent rules of statutory construction: (1) omission of words from a statute must be considered intentional; (2) words may not be inserted into a statute in the guise of statutory interpretation; (3) we will not supply omissions from a statute—redress being with the legislature; and (4) it is just as important to recognize what a statute does not say as what it does say. We conclude that undue influence is not a separate ground for revocation of a consent for adoption, and we need not reach the question of whether the evidence supports the district court's finding of a lack of undue influence.

■ Although the foregoing effectively disposes of the precise issues formulated by appellant in this appeal, fairness to appellant requires that we address what we perceive as her underlying issue: Whether the evidence was sufficient to support the district court's conclusion that the relinquishments and consents were executed without fraud or duress and thus were valid. This is a factual inquiry, and our standard of review of factual questions is well settled. We will not substitute our judgment for that of the trier of fact. *In re Adoption of D.P.*, 583 P.2d 706. We presume the findings of fact are correct, and they will be set aside on appeal only when they are clearly erroneous or contrary to the great weight of the evidence. *O's Gold Seed Company v. United Agri–Products Financial Services, Inc.*, 761 P.2d 673 (Wyo.1988); *Yost v. Harpel Oil Company*, 674 P.2d 712 (Wyo.1983). Additionally, we assume that the evidence of the prevailing party is true, leaving out of consideration the other party's evidence in conflict therewith and giving every favorable inference to the evidence of the successful party which may fairly be drawn from it. *O's Gold Seed Company*, 761 P.2d 673; *DS v. Department of Public Assistance and Social Services*, 607 P.2d 911 (Wyo.1980).

With respect to fraud, the district court observed in its decision letter that "[t]he evidence on fraud, if any, was so slight as to have escaped the Court's recognition." We agree with the district court's conclusion that the relinquishments were not obtained by fraud, and appellant does not contend otherwise.

■ As previously noted, this Court has stated that duress exists whenever a person is induced, by the unlawful act of another, to perform some act under circumstances which deprive him of the exercise of free will. *SKMD*, 652 P.2d 974; *In re Adoption of D.P.*, 583 P.2d 706. The district court concluded that the relinquishments and consents were not obtained by duress. The evidence supports that conclusion.

■ The record reveals that the option of relinquishment had been discussed periodically with appellant by her caseworker and by her mental health counselor for several months prior to the actual execution of the documents. These discussions reflected the ongoing failure of appellant to profit from DPASS' efforts to intervene and improve her ability to properly care for her children. Events came to a head in the spring of 1985. On April 17th of that year,

DPASS received yet another complaint, apparently the third or fourth, of appellant's child abuse or neglect. In this instance, appellant, presumably in frustration with the child's "dawdling," tied JS to the family dog while they were out walking, and the dog ran off dragging the child behind it, resulting in various scrapes and bruises on the child. Thereafter, the caseworker informed appellant that, if there were any further incidents involving the children's safety, she would seek court action. On May 23, 1985, the caseworker received a physical examination report regarding the children which indicated that both children had lost weight, that both were anemic, and that their diet was "barely adequate, if that." A decision was made within DPASS to refer the case to the county attorney for termination proceedings.

The following day appellant attended a scheduled counseling session with her mental health counselor, who had been informed of DPASS' decision. The topic of relinquishment again arose, and appellant stated that she wanted to relinquish the children and that it would be for the best. The mental health counselor telephoned the caseworker and informed her that appellant wanted to relinquish the children. The mental health counselor then drove appellant to the DPASS office to meet with her caseworker and to execute the relinquishments and consents for adoption.

Appellant signed the documents in the caseworker's DPASS office in the presence of the caseworker, the mental health counselor, and a notary public. Initially, upon arriving at the caseworker's office, appellant expressed some reservations about relinquishing TR but, after further discussion, she decided to relinquish both children. Prior to execution of the documents, the caseworker carefully explained to appellant the significance and consequences of the relinquishments. Appellant testified that the caseworker read the documents to her word for word and that she, appellant, indicated that she understood them. Appellant testified that she was offered more time to think about it and that she was told it was not necessary for her to sign the documents that day. The caseworker testi-fied that she repeatedly asked appellant if she was sure that this was what she wanted to do and whether she needed more time to consider the decision. Even after the relinquishments were signed, the caseworker gave appellant an opportunity to change her mind, offering to tear up the documents, but appellant declined, indicating that she was sure of her decision. It was not until after the papers had been executed that the caseworker informed appellant of DPASS' prior decision to seek court termination. Appellant testified at trial that she understood the finality of the relinquishments when she signed them. The caseworker picked up the children at appellant's home on the same day that the relinquishments were signed. The caseworker testified that appellant had the children ready to go with all their belongings packed and that appellant was calm and unemotional upon this actual physical relinquishment of her children.

The above recited evidence, with conflicts properly resolved in favor of appellee, is sufficient to support the district court's finding that the relinquishments were obtained voluntarily and without duress. The district court correctly observed that the evidence was "completely devoid of any unlawful acts on the part of anyone which induced [appellant] to sign the relinquishments under circumstances which deprived her of the exercise of her free will." The evidence further supports the district court's observations that appellant's actual execution of the relinquishment and consent documents "was simply a culmination of something she had been considering, both pro and con, over a long period of time" and that she "fully understood what she was doing at the time she signed the relinquishments."

Evidence in the record also supports the district court's conclusion that appellant's later attempted revocation of the relinquishments was in the nature of an ineffectual conditional revocation in that appellant did not request that the children be returned to her but rather, as the district court noted, "merely attempted to conditionally revoke the relinquishment[s] un-

less the adoption could be carried out by her brother so that she would be able to visit the children." Finally, testimony in the record indicates that appellant's attempted revocation may have been partly or largely inspired by her mother's opposition to the relinquishments.

We cannot say on this evidence that the findings of the district court are clearly erroneous or contrary to the great weight of the evidence. We hold, therefore, that the relinquishments and consents for adoption executed by appellant are valid, binding, and irrevocable pursuant to the mandates of § 1–22–109(d).

At this juncture, having determined that the relinquishments and consents for adoption executed by appellant are valid, a review of the status of the children is appropriate. Appellant has relinquished both children for adoption. JS' father has similarly executed a relinquishment and consent for adoption, and he has not subsequently challenged that relinquishment. Thus, upon issuance of this opinion, JS will be immediately available for adoption.

■ A different situation is presented with respect to TR and her natural father. As noted earlier in this opinion, the district court, responding to a request from this Court, entered an order relating to the claims of the fathers in which it indicated that the claims of TR's father had been terminated by court order dated May 30, 1986, and that he did not appeal that order. That termination order, however, was reversed on jurisdictional grounds by this Court, and the failure of TR's father to appeal from that defective order does not render it valid as to him. It will be incumbent upon the State/DPASS, in order to free TR for adoption, to either secure a relinquishment and consent to adoption from TR's father or proceed with termi-

nation proceedings against him. In the original proceeding TR's father notified the district court, through counsel, that he elected not to appear and proceed in the matter. Thus, under the circumstances, it might be anticipated that he will voluntarily relinquish TR for adoption.

We also note, as the culminating effect of these rather convoluted proceedings, that once a final decree of adoption is entered for these children, the remaining parental rights of the natural parents, such as they may be, will come to an end. Wyo. Stat. § 1–22–114 (1977) [4]. *See also ALT v. DWD*, 640 P.2d 73 (Wyo.1982) (decrees of adoption terminated natural father's parental rights); Unif. Adoption Act § 14, 9 U.L.A. 58 (1971) (final decree of adoption terminates parental rights of natural parents); and H. Clark, *supra*, § 21.1 at 565 and § 21.4 at 606 (adoption decree ends legal rights and obligations between child and his natural parents). *Cf. PAA*, 702 P.2d 1259 (parental rights of nonconsenting parent terminated by operation of law pursuant to Wyo.Stat. § 1–22–110 (1977)).[5] The district court's order in this case, however, stated in part:

1. The relinquishment and consent to adoption executed by [appellant] on May 24, 1985, with regard to [TR] and [JS] are valid and binding, effectively extinguishing the parental rights of [appellant] with regard to the children in question as of the date upon which said documents were executed[.]

■ To the extent that the order purports to formally terminate appellant's parental rights, it is in error. Actual and final termination of parental rights can only be accomplished in Wyoming either through proceedings brought pursuant to the termination statutes or, as just discussed, upon the entry of a final decree of

---

**4.** Section 1–22–114(a) provides:

Upon the entry of a final decree of adoption the former parent, guardian or putative father of the child shall have no right to the control or custody of the child. The adopting persons shall have all of the rights and obligations respecting the child as if they were natural parents.

**5.** The adoption statutes of some states provide, and some courts have held, that a valid relinquishment deprives the natural parents of parental rights but that it may not always terminate certain parental obligations to the child, such as support, which may continue until the entry of a final decree of adoption. *See* 2 C.J.S., *Adoption of Persons* § 12 (1972), and Colo.Rev. Stat. § 19–5–104 (Cum.Supp.1988).

adoption. Thus, although we affirm, we will remand to the district court with instructions to modify its order by deleting the reference to a termination of parental rights. *See Gregory v. Sanders*, 635 P.2d 795 (Wyo.1981), *appeal after remand* 652 P.2d 25 (Wyo.1982), and *Allen v. Allen*, 550 P.2d 1137 (Wyo.1976) (affirming but directing district court to modify judgment).

As a final matter, we should acknowledge our concern with the inordinate lapse of time involved in these proceedings from the time the consents were obtained until the subject children will finally be available for adoption. We are aware that the ability of agencies such as DPASS to find adoptive homes for specific children generally diminishes over time as the children grow older. In the instant case, the delay in placing these children in adoptive homes is the direct result of the continuous litigation since 1985 concerning the availability of the children for adoptive placement. DPASS has been precluded from placing these children in adoptive homes because of the unsettled legal status of the children. We anticipate that our decision herein regarding the validity of relinquishments and consents for adoption will avert many such problems in the future. A question arises, nevertheless, as to the duration of valid consents. In this respect, we observe that § 1–22–109(d) provided that relinquishments and consents were *irrevocable*, with the limited exceptions as discussed, and the statute did not provide for any expiration of the consents if adoption had not occurred within a prescribed period of time.[6] In 2 C.J.S., *supra*, § 68c at 495, the rule is stated that "mere lapse of time before the consent is acted on and adoption proceedings prosecuted does not render the consent ineffective." This case does not involve a failure or inability of DPASS, over an extended period of time, to secure an adoptive placement for a child clearly freed for that purpose by relinquishing parents. In this case, the agency's hands have been tied by litigation.

TR is now seven years old, and JS is six years old. The record reveals that the children initially exhibited emotional and behavioral problems in their foster placements after being relinquished. Consequently, in order to prepare the children for an adoptive placement, DPASS placed them in a group foster care-treatment program for troubled children. Testimony by their supervising social worker at the hearing below indicated the children responded well to this placement. We anticipate that DPASS will be able to expeditiously arrange for an adoptive placement for these young children, provided, however, in the case of TR, that no further difficulties are encountered in freeing her for adoption.

Affirmed but remanded to the district court for modification of the order in accordance with this opinion.

THOMAS, J., dissents and files an opinion in which GOLDEN, J., joins.

GOLDEN, J., dissents and files an opinion in which THOMAS, J., joins.

URBIGKIT, Justice, concurring in the result.

Nothing in this case can give me comfort, but somewhere out of this litigative morass the interest of two children must receive some present priority. We have a mother, two different fathers and two children, now age seven and six, that have been intrinsically involved with the Big Horn County Office of Public Assistance and Social Services since their birth. For everyone and specifically these two children, there has been more than sufficient catastrophe for any providence in a single lifetime.

In 1985, now four years ago, a consent to relinquishment was signed and the future of these two children has been in litigation ever since while being placed in a parade of foster home care. Although I concur in the result, it is not to approve the course of this litigation from relinquishment form execution, which was obviously distrusted, to termination for cause, granted, and then reversed and returned for retrial. My particular disaffinity is derived from the present course of this litigation where the

---

**6.** The 1986 and 1987 amendments to § 1–22–109  did not change subsection (d).

distrusted relinquishment and consent to adoption form was pulled back off of the shelf after reversal of the termination decision as a different predicate for termination of the mother's parental rights. This is where we are today. By now, we do not have definable knowledge whether anything more substantively remains in this litigation beyond the aimless visitations of the litigative affect on defenseless children in addition to the intransigence of continued litigation, although unquestionably manifesting deep-seated sincerity and concern of the courts, counsel and social agency.

In any event, I now say enough, without necessarily adopting a preclusive attitude of the validity of the original relinquishment or its viability as a consent to adoption. In adopting this thesis which portends in estoppel by inability to terminate litigation, I conclude that these children deserve stability and, for this reason, concur in the result to achieve for them some finality before it becomes too late for society to provide any chance of normality during their childhood. Another trial, another year or more and what has been won? Within the application of practical experience, it is contemplated that following some stability of remaining childhood, these children can sort out their family relationships as adults as the choice may then be presented.

The mother, during this four year course of litigation, has failed in two separate contested trials to convince the trial court that the children should be returned to her to raise. *See Matter of T.R.*, 726 P.2d 500 (Wyo.1986). The time must come when litigation ends and stability is achieved. *Cf. Toltec Watershed Imp. Dist. v. Johnston*, 717 P.2d 808 (Wyo.1986) (Urbigkit, J., dissenting) and *Matter of Adoption of BGD*, 713 P.2d 1191, *reh'g granted* 716 P.2d 983, *opinion confirmed* 719 P.2d 1373 (Wyo.1986). Even though the original trial judge who conducted the two trials has now retired, I disfavor putting these children through the process one more time after this delay. In their best interest, finality of decision is due and litigation must end. *In Interest of J.L.*, 761 P.2d 985 (Wyo.1988).

I concur in the result to permit a present conclusion to this compendium of litigation and to establish some permanency for these two children within whatever choices society can now afford.

THOMAS, Justice, dissenting, with whom GOLDEN, Justice, joins.

I join in the dissenting opinion of Justice Golden. I perceive the process approved in this case to be akin to the riddle about whether a tree falling in the forest makes a sound if no one is there to hear. The riddle is unsolvable and leads nowhere. This is true of a relinquishment and consent to adoption when there is no adoption. A legal limbo results. The relationship of parent and child is effectively severed, but there is no resolution of the status of either. The result is quite different from that described in *§ 14–2–317, W.S.1977 (July 1986 Repl.)*. Resolution can be attained only by a final decree of adoption, which probably will never occur. For this reason, I add some thoughts of my own.

When DPASS initiates a proceeding to terminate parental rights, it does so on the premise that the action, even though it interferes with a fundamental liberty interest, is necessary in order to protect the safety and welfare of the child. When DPASS is pursuing a valid adoption proceeding, the primary concern is the best interest of the child advanced with the concurrence of the natural parent or parents and, in that instance, the necessity of protecting the safety or welfare of the child, which justifies the deprivation of the fundamental liberty interest of the parent, is not an issue. The motivation and justification for these different proceedings are quite disparate. The burden of proof in a termination proceeding is upon DPASS, and clear and convincing evidence is required. Obviously, that burden of proof is very different from simply defending a claim of fraud or duress in a proceeding in which the parent seeks to revoke a relinquishment and consent to adoption. In this

latter situation, the burden of proof is upon the natural parent.

It is the obligation of the state agency to decide whether it needs to protect the safety or welfare of the child or whether it is advancing an adoption of the child and then to choose its ground and proceed accordingly. In this instance, DPASS did choose the ground. It chose to proceed with a termination of parental rights. When that was frustrated because of the failure to comply with essential requirements, the state agency offered an executed relinquishment and consent to adoption as an alternative to the termination of parental rights proceeding that it had initiated. It substituted an orange for an apple. This court now permits DPASS to make that shift and to avoid its burden of demonstrating by clear and convincing evidence the necessity for interfering with the fundamental liberty interest of the parent and child. Instead, DPASS is permitted to assert that the burden is on the natural parent to show fraud or undue influence. As Justice Golden astutely points out, the majority imposes this requirement in the absence of the policy that justifies the rule. There are no adoptive parents whose interests demand that the relinquishment and consent be essentially irrevocable.

By the majority decision, we have approved a tactic of DPASS that never will permit us to determine whether the State could meet its appropriate burden. Agents of DPASS are entitled to assume that, after initiating a termination proceeding, the burden of proof always can be avoided by obtaining a relinquishment and consent for adoption which would be irrevocable. There is a manifest opportunity for, and a strong implication of, duress in such a process. I would avoid that difficult dilemma by a rule that a misrepresentation is present whenever a relinquishment and consent to adoption is obtained by DPASS without a planned adoption. (While styling this situation an artifice may be apt, that word for me falls short of describing the event, which is a fraud.) Absent a pending adoption, DPASS is unable to articulate the proper ground for seeking the relinquishment and consent for adoption. It cannot

speak the truth, that it is choosing to avoid proof by clear and convincing evidence of a statutory ground for terminating the rights of the parent. Its silence is very much like the tree falling when there is no one there to hear. I would treat the unsolvable circumstance as fraud as a matter of law unless the record very clearly demonstrated that the parent executing the consent and relinquishment for adoption was apprised of the fact that it was to be used as a substitute for termination of parental rights; that DPASS deliberately chose the alternative; that DPASS was avoiding a difficult burden of proof; and that all the effects of the consent and relinquishment without a planned adoption were clearly presented to the executing parent.

I recognize, in this instance, that there really is nothing likely to happen that will save these children from the foster home process. My concern is the development of a legal principle that will inflict this unfortunate result on unknown numbers of children in the future. Given the prospect of future harm, it is inappropriate to approve this facile maneuver by an agency of the State. I would reverse and remand for resolution of the proceeding to terminate parental rights.

GOLDEN, Justice, dissenting, in which THOMAS, J. joins.

I dissent, and I also join in the dissenting opinion of Justice Thomas.

I would reverse the district court's decision since I believe that W.S. 1–22–109(d) (1977), the irrevocability provision, does not apply where, as here, no petition of adoption has been filed or is reasonably likely to be filed in the future.

When a petition for adoption is filed and an adoption is in the offing, the irrevocability provision promotes the public policy of the adoptive child's complete integration into the new adoptive family. As expressed in *Smith v. Welfare Department of City and County of Denver*, 144 Colo. 103, 355 P.2d 317, 320 (1960), "policy dictates that persons assuming the role and responsibilities of adoptive parents be as-

sured that in doing so they are not adopting a lawsuit in the bargain." This court clearly spoke of this policy when it said:

> [Adoption] affords in so many instances a future in every respect which a child may not otherwise enjoy. It fills a void for those not blessed as natural parents and those others who also have the capability and overwhelming desire to care for and raise the helpless. They, too, must not be deprived when they take a lawful, sincere, caring, and good faith course, especially when they have been committed to and are willing to assume or have assumed parental responsibilities.
>
> The legislature has recognized irrevocable consent as a meaningful device through which such a commitment may be made secure. This is a matter of public policy which is the business of the legislature.

*In re Adoption of MM,* 652 P.2d 974, 978 (Wyo.1982).

In this case no petition for adoption has been filed, and at oral argument the court was told that no petition for adoption of these children will ever likely be filed. Consequently, the public policy supporting the application of the irrevocability provision does not come into play.[1] There is no new family into which the relinquished children will be integrated, there are no adoptive parents to be assured, and there is no commitment to be made secure. It is axiomatic that when the reason for the rule ceases to exist, the rule ceases to exist.

In 2 H. Clark, *The Law of Domestic Relations in the United States,* § 2.15, at 613–14 (2d ed. 1987), appears the following statement: "If the children do not appear to be adoptable, such a relinquishment might condemn them to years of foster homes, possibly shifting from one foster home to another a fate which hardly seems preferable to a more stable life with their natural [parent]." I fear Clark's words are cruelly prophetic for P.R.'s children.

I have an additional reason for believing that the irrevocability provision does not apply to the facts of this case. We recently observed that:

> Termination of parental rights is accomplished in Wyoming either by a proceeding pursuant to the termination statutes or, in the case of an adoption proceeding, by the entry of a final decree of adoption subsequent to a validly executed relinquishment of custody and consent to adoption. See Wyo.Stat. § 1–22–114 (1977) (entry of final decree of adoption ends parental rights of former parent).

*State of Wyoming, ex rel. TRL, a minor v. RLP and DLL,* 772 P.2d 1054, 1057–58 (1989). There, this court refused to recognize a natural father's attempted voluntary relinquishment and consent to adoption, agreed to by the natural mother and approved by the district court. In particular, we found that there had been a failure to appoint a disinterested guardian *ad litem* for the child and to otherwise accomplish the termination proceeding in accordance with the statutorily established procedures. *Id.,* at 1057. In agreeing with the state's characterization of the natural father's consent to adoption as a sham, and after concluding that the termination proceeding was not saved by styling it as a voluntary relinquishment of custody and consent to adoption in accordance with W.S. 1–22–109, we stated forcefully:

> It is clear, however, that adoption was never contemplated in this case. As argued by the State in the proceeding below, the mother has no plans for marriage and hence no plans for an adoption of the child by a stepfather. We can only conclude that the attempt by these parents to posture this case as an adoption case is merely an artifice designed to detour attention from the fact that they bargained away the fundamental rights of the child in a proceeding in which the child's best interests, if they were considered, were given short shrift.

*Id.,* at 1058.

That passage applies here with full force. D–PASS's attempt to posture this case as

---

1. "If a statute is to make sense, it must be read in the light of some assumed purpose. A statute merely declaring a rule, with no purpose or objective, is nonsense." K. Llewellyn, *The Common Law Tradition* 374 (1960).

an adoption case is an artifice designed to deter attention from D–PASS's apparently successful effort of extinguishing the fundamental liberty interests [2] of the children and the natural mother to be with each other as a family unit without a court of law ever considering whether the children's condemnation to years of foster homes is in their best interests. Unlike the parental rights termination proceeding which requires the court's express determination of the best interests of the child, and unlike the true adoption proceeding, which also requires that express determination, D–PASS's "Irrevocable voluntary relinquishment and consent" procedure establishes a third statutory device, hitherto unknown to the law, by which the fundamental liberty interests of the natural child and natural parent are extinguished by agency fiat without a determination by a factfinding court of law of what placement is in the best interests of the child. In my judgment the legislature never intended this "irrevocable voluntary relinquishment and custody" scheme.

Being faithful to this court's past pronouncements on the subject, I would strictly construe the adoption statutes, particularly W.S. 1–22–109(d), containing the irrevocability provision. *Adoption of MM,* 652 P.2d at 979. The title of W.S. 1–22–109 is "Consent to Adoption," and the language of the statute provides that the written relinquishment and consent shall be filed with the petition to adopt. In *Matter of*

*Adoption of RHA,* 702 P.2d 1259, 1264–65 (Wyo.1985), this court said: "Terminating parental rights by operation of law under § 1–22–110 *is always in connection with an adoption.* Terminating parental rights under §§ 14–2–309 through 14–2–318 may be for purposes other than the possibility of an adoption." (Emphasis added.) We noted earlier, in our quotation from *RLP,* that under § 1–22–114, only entry of the final decree of adoption ends the parental rights of the former natural parent. I would apply the concept that we must look to the statutory scheme as an integrated plan. I would give primacy to the basic principles permeating the law of adoption: We are dealing with fundamental liberty interests and the best interests of children. As a result of the foregoing analysis, I would conclude that the irrevocability provision does not apply to the facts of this case, and the natural mother revoked her relinquishment and consent as she had a right to do.

I would vacate the order of the district court and remand for that court's entry of an order immediately returning these children to their mother.

---

2. *DS and RS v. Department of Public Assistance and Social Services,* 607 P.2d 911, 918 (Wyo. 1980).