**JK, as next best friend of her minor child and grandchild, DK and Baby X, Appellant (Petitioner),**

v.

**MK, DK, and Ellen McGEE, as an individual and in her official capacity, and The Wyoming Children's Society, Appellees (Respondents).**

No. C–99–1.

Supreme Court of Wyoming.

May 2, 2000.

Representing Petitioners: Joe A. Baca and Sue Davidson of Aspen Ridge Law Offices, P.C., Cheyenne, Wyoming. Argument by Mr. Baca.

Representing Respondents: Gary R. Scott of Hirst & Applegate, P.C., Cheyenne, Wyoming.

Representing The State of Wyoming: Gay Woodhouse, Attorney General; Michael L. Hubbard, Deputy Attorney General; Harry D. Ivey, Assistant Attorney General; Christopher Petrie, Assistant Attorney General. Argument by Mr. Petrie.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN and HILL, JJ.

GOLDEN, Justice.

After signing a consent to adoption and relinquishment of child custody, the minor natural father (Father) immediately notified Appellee Wyoming Children's Society (WCS) of his intent to revoke his consent. Father's mother, on behalf of her son and the baby (collectively, Petitioners), began judicial proceedings to revoke Father's consent and relinquishment and obtain custody of his newborn son, Baby X. He joined individuals Ellen McGee of WCS, the natural mother (Mother), and natural maternal grandmother (collectively, Respondents) in his suit, but never served the prospective adoptive parents. Months later, after the adoption decree was apparently finalized, the district court granted summary judgment to appellees ruling that, as a matter of law, no statutory grounds existed for revoking Father's consent. Petitioners appeal.

We dismiss those issues requiring joinder of the prospective adoptive parents and affirm the grant of summary judgment on the issue of whether fraud or duress existed requiring Father's consent to be set aside.

## ISSUES

Petitioners present these issues for our review:

I. Was Father's consent to adoption given under duress or as a voluntary, knowing waiver, at a time when he was competent to give consent as required by law?

II. Does W.S. § 1–22–109 violate the U.S. and Wyoming Constitutions or was it unconstitutionally applied in the facts of this case?

III. Should guardians ad litem be appointed to represent minors in adoption cases?

Respondents present this single statement of the issue:

1. Did the district court err in granting summary judgment to all of the Respondents on all of the claims asserted by the Petitioners in their Amended Petition?

The State of Wyoming filed a brief stating these issues:

I. Whether Appellant was denied procedural due process by operation of Wyo. Stat. § 1–22–109.

II. Whether Appellant was denied substantive due process by operation of Wyo. Stat. § 1–22–109.

III. Whether Wyo. Stat. § 1–22–109 violates the U.S. and Wyoming Constitutional rights to equal protection.

## FACTS

■ Because this appeal is from an order of summary judgment, we review the facts in the light most favorable to Petitioners. *In Re HC*, 983 P.2d 1205, 1207 (Wyo.1999).

Seventeen-year-old Father suspected that his eighteen-year-old girlfriend (Mother) was pregnant in early February of 1998, and confronted her about it. Mother denied she was pregnant. On the morning of February 23, 1998, Mother picked up Father at his house before school began and asked him to drive her to a hospital in Ft. Collins, Colorado, because she was experiencing stomach pains. He took her to the emergency room in Ft. Collins and doctors informed him that Mother was pregnant and the birth was im-

minent. Mother delivered a son that afternoon. On the day of the birth, a social worker visited the couple and discussed the possibility of adoption. During that meeting, Father believed that the social worker informed them that if the couple did decide to put the baby up for adoption, they would have up to six months to change their minds and get the baby back. Also on that day, the maternal and paternal grandmothers arrived at the hospital and more discussions concerning adoption were held with the couple. The paternal grandmother contacted Father's aunt in Salt Lake City and asked if she would consider adopting the baby; however, the aunt declined. Late that night, Father drove back to Cheyenne to get clothes for both him and Mother, returned to the hospital, and spent the night in Mother's hospital room.

The next day, Father did not go to school and stayed with Mother. Another social worker arrived and offered free counseling to the Mother and talked to both about adoption. At Mother's request, that social worker contacted a child adoption agency in Cheyenne, Wyoming. Father testified in his deposition that this social worker also informed them they would have a six-month period for changing their minds.

Ellen McGee from the Wyoming Children's Society (WCS) arrived at the hospital about midday of February 24. She brought profiles of adoptive families, a notary, and consent and relinquishment of custody papers for the couple to sign. After speaking to the couple about several of the profiles, Ms. McGee asked if the couple was ready to sign the papers. The couple declined and stated that they needed more time to think about it. The maternal grandmother arrived, and Ms. McGee stated that she would be back in an hour and left. She returned in less than an hour, primarily discussed adoption with the maternal grandmother while the couple listened, but was told that the couple needed more time and more profiles. Ms. McGee offered to place the baby in foster care, and Mother informed her that the baby would be left in the hospital. Mother preferred that the baby stay at the hospital for the full forty-eight hour post-birth time that was rou-

tinely recommended for newborns. In her affidavit, the maternal grandmother states that she was assured by the hospital that the baby would not be considered abandoned for this time period. Father left the hospital to go to work, and Mother was discharged and left the hospital with the maternal grandmother and returned home to Cheyenne.

Late in the evening of February 24, Mother, the maternal grandparents, Father, and the paternal grandmother met at Mother's house and further discussed the adoption. Mother and Father told their parents that they needed more time, and it was agreed that more time would be given to them. A few minutes later, Mother's parents had the couple rejoin them for further discussions. Mother stated that she wanted to give the baby up for adoption, and Father stated that he thought adoption would be best. The paternal grandmother apparently indicated that she disagreed with adoption but would not interfere. The maternal grandmother stated that she would contact WCS, and it was agreed that Father would return the next day. Father and his mother left to return home. Father told his mother that he wanted to keep the baby, but that he had told Mother he would support her decision.

Father did not go to school again on February 25, and he returned the next morning to Mother's home without the paternal grandmother. He learned that Ms. McGee was expected and waited with Mother and her parents for Ms. McGee to arrive. He did not contact his mother, and she was not present that morning. Father testified that during the wait, the maternal grandmother and Mother discussed the good choice that had been made, but Father did not participate. Ms. McGee and another woman arrived and, in his affidavit, Father claims that Ms. McGee told Father that if he did not remove the baby from the hospital, the state of Colorado was going to take the baby as an abandoned baby. Ms. McGee read a relinquishment of custody and consent to adoption form to the couple, pointing out variations between the two forms, and then had Father and Mother each sign a form. At some point, the couple selected the adoptive family, who remained nameless. Father could not remember whether it was before or after he signed the consent.

In his deposition, Father testified that he believed that he was releasing and relinquishing his child to foster care to avoid abandonment and was consenting to adoption by the family selected at a later time. He testified that he believed that the actual adoption papers would be signed later. Father was not given a copy of the papers he had signed. At the deposition, Father was asked, "Do you understand what this statement means, 'I acknowledge and agree that this relinquishment and consent terminates all rights which I have to this child.'" Father replied, "I'm giving up my rights for the baby from what I understand."

After he signed these papers, Father informed Mother that he believed the baby should not be placed in foster care and given up for adoption. He believed that Mother agreed and was going to arrange to get the baby back. Later, the couple and the maternal grandmother shopped for and purchased baby clothes to take to the adoption agency. Father thought the clothes were purchased for the purpose of keeping the baby and told his mother that they would be picking up the baby that day. On February 27, Father, Mother, and the maternal grandmother delivered the baby clothes to the agency, and the couple held the baby. Mother and Father signed a form that required the adoptive parents to provide pictures of the baby to the birth mother several times a year until age five and then every six months until the age of majority. This form was signed with the first names of Father and Mother and the adoptive parents. The date beside all four names is February 27, apparently the date that the adoptive parents were given physical custody of the baby. At the adoption agency, Father learned that Mother still intended to give the baby up for adoption. He left the agency, contacted his mother and asked her to intervene. Father, his mother, and brother went to the agency and asked Ms. McGee to return the baby to him. Father was told that the baby had already been placed with the adoptive family. Ms. McGee refused to assist Father in the return of his baby, and angry words were exchanged.

Father hired legal counsel, and on March 4, 1998, counsel filed a petition requesting the district court to establish Father's paternity, award him custody of the minor child, establish child support, revoke and rescind the Relinquishment of Parental Rights and Consent to Adoption, declare Wyo. Stat. Ann. § 1–22–109(d) unconstitutional, issue a temporary restraining order and enjoin adoption proceedings which have been or may be initiated with respect to Baby X, require Baby X to be turned over to Father pending further hearing, and requested attorneys' fees and costs and money damages for negligent and/or intentional infliction of emotional distress and conspiracy. This petition was brought against Mother, the maternal grandmother, Ms. McGee, individually, and WCS. The adoptive parents were not joined in the action.

In the petition, Father alleged that WCS had told him that the baby was in the custody of "Baby X's prospective adoptive parents." An "Affidavit in Compliance with W.S. § 20–5–110" was filed by Father stating that this unknown couple had physical custody of the child. On March 5, 1998, Father filed a motion to appoint a guardian ad litem for Baby X. On March 17, a response was filed to the petition, admitting that Baby X had been placed in the custody of the prospective adoptive parents. Affirmative defenses alleged were a failure to state a claim upon which relief can be granted, plaintiffs do not have standing to bring the action, and the petition was unsigned by the attorney of record. Father filed an amended petition on March 17, 1998, that included John Doe 1 and Jane Doe 1 and petitioned for a writ of habeas corpus. In his amended petition Father alleged that he was informed Baby X had been placed in the custody of Baby X's prospective adoptive parents, John Doe 1 and Jane Doe 1, who had not been identified as of March 13, 1998. In their response to the amended petition, Respondents denied this allegation in its entirety despite having admitted in the earlier answer that the baby was in the physical custody of the prospective adoptive parents. Petitioners filed an attorney's consent to appointment as guardian ad litem, and Respondents objected to the appointment of a guardian ad litem. On April 16, 1998, the State, which was served but not joined as a party, filed its response to the constitutional claim.

On May 11, 1998, the district court denied the motion to appoint a guardian ad litem for the baby. Apparently, this order followed a hearing; however, the transcript has not been included in the record. On July 6, 1998, the district court notified the parties that it intended to dismiss the petition sua sponte. Respondents WCS and Ms. McGee filed a motion for summary judgment on July 10, 1998, and Mother and the maternal grandmother filed a motion for summary judgment on July 27, 1998. Apparently in the interim, depositions were taken; however, only selected portions have been made a part of the record. On August 4, 1998, Petitioners filed a motion to amend the petition, filed an amended petition that did not include the prospective adoptive parents as parties, renewed their motion to appoint a guardian ad litem for Baby X, filed a motion to appoint a guardian ad litem for the father, a motion to require production of hospital records and release, a motion to order notice in adoption proceedings, and a combined motion opposing the motions to dismiss and for summary judgment.

Although the record does not contain the transcript, apparently a hearing was held on these motions, and on September 29, 1998, the district court issued an order allowing the amended petition, dismissing it with prejudice and granting summary judgment to Respondents, denying notice of adoption proceedings and granting costs to Respondents. Petitioners did not file any motions to stay adoption proceedings pending appeal, but filed a notice of appeal that did name John and Jane Doe 1 on October 29, 1998. On appeal, Petitioners' brief presents neither issue nor argument on their money damages claims, and they have apparently abandoned them. Oral argument was held on September 22, 1999, and at that time, this Court was informed that the baby's adoption had been finalized in August of 1998. The adoptive parents have never been identified or served in any of the above actions.

## DISCUSSION

Adoption was not known at common law and is a creature of statute to be strictly construed. *Adoption of MM*, 652 P.2d 974, 979 (Wyo.1982). The basic principles permeating the law of adoption are fundamental liberty interests and the best interests of the children. *Matter of TR*, 777 P.2d 1106, 1118 (Wyo.1989) (Golden, J., dissenting). Under Wyoming's statutory adoption scheme, natural parents may consent to adoption and relinquish custody of their child after the birth. Wyo. Stat. Ann. § 1–22–109 (LEXIS 1999). Their consent is irrevocable unless obtained by fraud or duress, and the consent of a minor parent is valid and may not be revoked solely because of minority. Wyo. Stat. Ann. § 1–22–109(d) (LEXIS 1999).

In Wyoming, a natural parent's attempt to revoke his consent to adoption and relinquishment of custody is considered a threshold issue to be resolved before entry of a final adoption decree. We have said that until the threshold question of consent is resolved the identity of the adoptive parents is irrelevant as is the fitness of the adoptive parents and the best interests of the child. *Matter of Adoption of RHA*, 702 P.2d 1259, 1264 (Wyo.1985). In *Matter of Adoption of MSVW*, 965 P.2d 1158 (Wyo.1998), this Court held that a natural father has the right to attend the adoption hearing for the opportunity to contest the validity of his consent when the claim is made before the entry of the final adoption decree. *Id.* at 1164. In this case, following a hearing on the issue of whether his consent was valid, Father's motion to attend the adoption proceedings was denied. This Court has previously held that once the issue of consent has been resolved, under Wyoming's statutory scheme, the natural father is "a stranger to the adoption proceedings." *Adoption of RHA*, 702 P.2d at 1264. On appeal, Father presents the issue of whether his consent is irrevocable under Wyoming statute.

Petitioners, however, did not join or serve the prospective adoptive parents in their final amended petition. Because resolution of the consent issue presumably adjudicates the rights of the prospective adoptive parents, it would appear they are indispensable parties as to all issues presented by Petitioners. Unfortunately, the record is not adequate to properly inform us as to why the prospective adoptive parents are not parties. At oral argument, Petitioners claimed that WCS refused to divulge their names, making service impossible. Also at oral argument, counsel for the appellees informed the Court that the adoption of the baby had been finalized in another jurisdiction, presumably out of state; however, the final adoption decree is not part of the record, and, therefore, not properly before us. Petitioners seem to be aware of the final adoption decree and have pursued their appeal, and we have, therefore, decided to address the threshold issue of whether Father may revoke his consent under the statutes. Petitioners have also pursued their constitutional and guardian ad litem issues, but we find that their failure to join the adoptive parents precludes our review of those issues. We first address this issue of indispensable parties.

### Indispensable Parties

*Adoption of RHA* permits us to determine the validity of a natural parent's consent under Wyoming statute without regard to whether the adoptive parents have been joined. Consent of the natural parent to the adoption of the child is a jurisdictional prerequisite to a valid and binding decree of adoption, and, ordinarily, consent proceedings are the first part of a bifurcated procedure for an adoption under the jurisdiction of a Wyoming court. *See Adoption of AMD*, 766 P.2d 550, 552 (Wyo.1988). Where, as here, the parties do not present the court with a final adoption decree because it has apparently been entered in another jurisdiction, we are limited to the Petitioners' request that we determine whether, as a matter of law, Father's consent is irrevocable under Wyoming statute. Father's other claims that the statute is unconstitutional and the district court erred in failing to appoint guardian ad litems for him and the baby raise the issue of whether the claims must be dismissed because the adoptive parents are indispensable parties and were not joined in the final amended petition and have not been

properly served with this appeal. The issue of indispensable parties is one which this Court may raise upon its own motion. *State, By and Through Christopulos v. Husky Oil Co. of Delaware*, 575 P.2d 262, 268 (Wyo. 1978).

In this appeal, it is not clear to us that the final adoption decree was entered outside of Wyoming, but we note that usually adoption decrees are issued under the particular state's own statutory scheme. If in fact the adoption has been accomplished in another state, presumably the Petitioners will have the option of setting aside the adoption under the consent revocation procedures or other applicable sections of that state's statutory scheme. However, neither the record nor the parties have fully informed this Court of the exact nature of their relief sought in light of the finalized adoption decree in another jurisdiction, and we therefore proceed as if no finalized adoption decree has issued.

■ Wyoming Rule of Civil Procedure 19 requires "[j]oinder of persons needed for [a] just adjudication." A court must first determine if the person in question meets certain criteria, and, if so, the person is considered a "person to be joined if feasible." W.R.C.P. 19(a). In cases where joinder is not feasible, the court must then examine four considerations to determine whether "in equity and good conscience" the action should proceed. W.R.C.P. 19(b). If, in equity and good conscience, the action cannot proceed without the person in question, that person is considered indispensable and must be joined or dismissal will result. *Lamb v. Wyo. Game and Fish Comm'n*, 985 P.2d 433, 439 (Wyo. 1999); W.R.C.P. 19(b); *Albrecht v. Zwaanshoek Holding En Financiering, B.V.*, 762 P.2d 1174, 1178 (Wyo.1988); *Reilly v. Reilly*, 671 P.2d 330, 332 (Wyo.1983). Rule 19(c) states:

> *Pleading reasons for nonjoinder.*—A pleading asserting a claim for relief shall state the names, if known to the pleader, of any persons as described in subdivisions (a)(1) and (a)(2) hereof who are not joined, and the reasons why they are not joined.

The proper procedure for complying with Rule 19(c) is contained in W.R.C.P. Form 26:

**Allegation of reason for omitting party.**

When it is necessary, under Rule 19(c), for the pleader to set forth in his pleading the names of persons who ought to be made parties, but who are not so made, there should be an allegation such as the one set out below:

> John Doe named in this complaint is not made a party to this action, because he is not subject to the jurisdiction of this court.

Petitioners' final amended petition did not name Jane and John Doe as a party and did not assert any reason for not joining them.

■ We stated in *Rivermeadows, Inc., v. Zwaanshoek Holding & Financiering, B.V.*, 761 P.2d 662, 668 (Wyo.1988):

> This Court has long recognized the traditional definition of an indispensable party with regard to W.R.C.P. 19(a). In *American Beryllium & Oil Corporation v. Chase*, 425 P.2d 66, 68 (Wyo.1967) (quoting from *Amerada Petroleum Corporation v. Rio Oil Co.*, 225 F.Supp. 907, 910 (D.C.Wyo.1964)), quoted in *Reilly v. Reilly*, 671 P.2d 330, 332 (Wyo.1983), we stated:
>
> > "An indispensable party has been defined as one without whose presence before the court a final decree could not be made without either affecting his interest or leaving the controversy in such a condition that its final determination might be wholly inconsistent with equity and good conscience. Whether or not a person is an indispensable party cannot be determined by a prescribed formula because the facts peculiar to each case are determinative of that question."

*See also Johnson v. Aetna Casualty & Surety Co. of Hartford, Conn.*, 608 P.2d 1299, 1305 (Wyo.1980), *Albrecht*, 762 P.2d at 1178. A series of four tests are set forth in these cases, a negative response in any one of which renders the absent party indispensable. These tests are:

> 1. Is the interest of the absent party distinct and separable?

2. In his absence can the court render judgment between the parties before it?

3. Will the decree made in his absence have no injurious effect on his interests?

4. Will the final determination in his absence be consistent with equity and good conscience?

*Oxley v. Mine and Smelter Supply Co.*, 439 P.2d 661, 663 (Wyo.1968). We do not see that any of these questions can be answered in the affirmative and decide that the prospective adoptive parents are indispensable parties whose joinder is required for the constitutional and guardian ad litem issues.

Having decided that joinder is necessary, we must determine whether joinder is feasible, and if not, whether equity and good conscience allows us to proceed. It would appear that joinder of the adoptive parents was possible. At the time this action was commenced, the baby was in the physical custody of the adoptive parents, and apparently no adoption petition had been filed in a Wyoming court. Petitioners had several procedural routes by which to locate the baby. Because Petitioners had requested custody and filed an affidavit of compliance with Wyo. Stat. Ann. § 20–5–110 (LEXIS 1999), Wyo. Stat. Ann. § 20–5–111 (LEXIS 1999) required the district court to order service on the party having physical custody of the child; however, Petitioners never requested that action by the district court. Petitioners requested the district court to enjoin adoption proceedings but failed to request a hearing on the matter and never acted upon the petition for writ of habeas corpus. The record shows that the Petitioners did not serve any interrogatories on WCS to determine the child's whereabouts or inquire as to whether Wyo. Stat. Ann. § 14–5–101 (LEXIS 1999)[1] had been implicated. Whether these avenues remain open to Petitioners cannot be determined upon the record that we have, but the record does not permit us to determine that joinder is not feasible. We dismiss the appeal as to the constitutional and guardian ad litem issues. Petitioners may amend their petition and proceed with discovery to

determine the location of the child and the status of the adoption proceedings.

*Revocation of Consent*

Father contends that his consent should be revoked under the statute for fraud, duress, and for minority created by the following circumstances as set forth in his pleading:

27. [Father] signed a form under fraud or duress and without knowledge of what he was doing and involuntarily, thinking that he had 6 months within which to exercise the option to rescind the form he had signed.

28. [Father] executed the form on February 25, 1998 without having the opportunity to deliberate and reflect in the decision and without the opportunity to seek independent counsel, and to ponder the alternatives available as required by law, the failure of which also amounts to duress and fraud in light of the force of circumstances represented by the facts of the case and averments set forth herein by paragraphs 1 et. seq.;

29. Respondent McGee is not an attorney authorized to practice law. She is [a] layman. Respondent McGee, as an individual and a representative of Respondent, Wyoming Children's Society, engaged in the unauthorized practice of law at all times and in all instances when she gave [Father] legal advice about the adoption process in Wyoming and in having obtained his signatures to the consent form.

30. Ellen McGee told [Father] he would be considered to have abandoned his infant son within forty-eight hours of his birth if a decision as to his son's placement had not been made.

*Duress*

We have said that "[d]uress exists whenever one, by the unlawful act of another, is induced to perform some act under circumstances which deprive him of the exercise of free will." *Adoption of MM*, 652 P.2d at 978. Generally, "where the natural parent has ex-

---

**1.** Interstate Compact on Placement of Children. WCS claims that it is a private agency. In *Adop-*

*tion of MM*, 652 P.2d at 981, we stated that this statute applied to private agency placements.

ecuted the consent after having been given an opportunity to deliberate and reflect on the decision and to seek independent advice and counseling and to ponder the alternatives available to [him], duress does not exist." *Id.* at 978. In *Matter of TR*, 777 P.2d at 1111, we discussed other courts' recognition of duress caused by the "force of circumstances," but the majority did not apply it. Father contends that the totality of circumstances here constituted duress under either definition.

Father alleges the totality of the circumstances from the day of the birth when he learned he was to be a father until he signed the adoption papers placed him under duress. We find that the circumstances from the time of the birth until Father signed the papers cannot be characterized as wrongful or unlawful acts constituting legal duress. Father and Mother first explored the notion of adoption by their own volition on the day of the birth, independently requested WCS contact them, independently requested more profiles of adoptive families, studied and selected a family, and both continued to examine that option until each signed their consent. If Father believed that he had six months to change his mind about adoption, Father has been very clear in the record to note that this mistake was caused by misinformation from Colorado social workers and not by WCS or Ms. McGee. Under Wyoming statute, mistake is not cited as a reason that would vitiate consent, particularly in the case where Father's mistake was not known or should not have been known by Ms. McGee or WCS. Wyo. Stat. Ann. § 1–22–109 (LEXIS 1999); *See also Matter of TR*, 777 P.2d at 1111 (plurality opinion stating that undue influence was not a statutory grounds for revoking consent.)

*Fraud*

We have said that "when fraud is alleged—in the context of an adoption consent—the representations must relate to a past or existing fact, and may not ordinarily be predicated upon a representation which relates to the future." *Adoption of D.P.*, 583 P.2d 706, 708 (Wyo.1978). However, fraud must be plead with particularity. W.R.C.P.

9. Respondents concede that fraud was plead properly in Father's amended petition. Fraud must be established by clear and convincing evidence and will not be imputed to any party when the facts and circumstances out of which it is alleged to arise are consistent with honesty and purity of intention and a person's good character. *Adoption of Hiatt*, 69 Wyo. 373, 382–83, 242 P.2d 214, 216 (Wyo.1952).

In his affidavit, Father claims that on the morning he went to Mother's house for further discussions with Ms. McGee, she told him that "if the baby was not taken away from the hospital, the State would take the baby as an abandoned baby." Father characterizes this statement as a "lie" and, relying upon *In Re Borton Estate*, 393 P.2d 808 (Wyo.1964), claims that Ms. McGee's conduct throughout was "constructive fraud consist[ing] of all acts, omissions, and concealment involving breach of a legal or equitable duty resulting in damage to another, and exists where such conduct, although not actually fraudulent, ought to be so treated when it has the same consequence and legal effects." Father states that he then signed the papers, believing he was placing the baby in foster care and the actual adoption papers would be signed later. In her defense, Ms. McGee claimed at oral argument that this statement is a true and honest statement and argues that Father has admitted neither she nor the other WCS agent told Father he was placing the baby in foster care or that he was not signing "actual adoption papers."

The night before the statement was made and with his mother present, Father had agreed that the baby should be placed for adoption. The maternal grandmother told Father that she would contact Ms. McGee the next morning, and Father arrived at Mother's home the next morning and stayed to meet with Ms. McGee. Father claims that he stayed to look at additional profiles and signed the papers because Ms. McGee told him that the baby would be considered abandoned if he did not. Father provides no proof that Ms. McGee's statement was a lie, but even assuming that Ms. McGee lied when stating that the baby would be considered abandoned that day, and she did it with the

intent to have Father sign the papers at that time in the absence of his mother and without further reflection, whether these circumstances and statements constitute fraud must be examined in conjunction with the consent form signed by Father. Ms. McGee read a consent form to Father that plainly stated the baby would be placed for adoption, Father's rights to the baby would be terminated, and custody would be relinquished. In his deposition, Father stated that he understood that he was giving up his rights to the baby when he signed the form. He does not allege that Ms. McGee told him that he could change his mind later. We find that Father signed the documents under the mistaken belief that he could revoke his consent within the next six months, and his mistaken belief that his signature was not final is insufficient to revoke his consent. Under these circumstances, because Ms. McGee did not know and had no reason to know of Father's mistaken belief, our standard of review requires that we view her statement as informational, complete, and not fraudulent.

 Father contends that, as a minor, his consent was not knowing and voluntary because he received advice from WCS, and not independent representation, while under pressure from Ms. McGee and the maternal grandmother, and because he consented so quickly after the birth. Further, he claims that his mistaken belief that he could revoke his consent within six months proves that his consent was not knowingly and intelligently made after examining all of the options available to a minor unprepared to support the baby. Father is essentially arguing that WCS should have advised him to seek independent legal counsel who could have plainly explained his legal rights to him under Wyoming statute and its failure to provide that notification to a minor provides grounds for this Court to find his consent was involuntary and should be revoked. Further, he asks us to rewrite the statute and provide for the

right to have some time period after the birth, whether a minor or an adult, before consent is permitted. Both of these concepts are embodied in the Uniform Adoption Act and the statutes of many other states; however, Wyoming statutes provide for neither. 2 Ann M. Haralambie, *Handling Child Custody, Abuse and Adoption Cases*, Uniform Adoption Act, at 78 (1999 Cum.Supp.App. 14–2). Although Father complains that the statute's design works to the disadvantage of minors freely and knowledgeably consenting, we have said that unless constitutional or judicial decision says otherwise, the adoption statutes represent public policy in this area. *Adoption of MM*, 652 P.2d at 978. The legislature, therefore, has the prerogative of permitting a minor to consent immediately after birth and with the independent representation of his own choosing, whether legal counsel, family or others, and forgo independent legal representation. Father's minor status does not permit revocation of his consent.

 Father also states that "Father was not given sufficient opportunity to reflect on his decision and to seek independent advice and counseling and to ponder the alternatives which the adoption specialist, Ellen McGee, had a duty to assure would occur." He provides expert testimony in the form of an affidavit to support his position that Ms. McGee owed Father a duty and breached that duty in various ways. Presumably, Father is referring to a tort duty, but does not specify what tort and does not provide further argument or authority for this proposition. Whether an adoption specialist owes a duty to the natural father presents a cause of action not recognized in Wyoming and whether it should be recognized presents a question of law that we have not yet decided. Father provides no argument or authority that such a duty should be recognized in this jurisdiction, and we are unable to further consider the issue.[2]

---

2. Father began his analysis by informing us that the consent form Father signed was a contract and subject to the contract defenses of mistake, fraud, duress and minority. We have said that when a party seeks damages in tort against the other party to a contract, the general rule is that tort liability can only result when a contracting party has a duty independent of its contractual duties. *JBC of Wyoming Corp. v. City of Cheyenne*, 843 P.2d 1190, 1197 (Wyo.1992) (citing *Preferred Marketing Assoc. Co. v. Hawkeye Nat'l Life Ins. Co.*, 452 N.W.2d 389 (Iowa 1990)). The court must decide if a duty exists as a matter of law. *Hamilton v. Natrona County Educ. Ass'n,*

## CONCLUSION

Under Wyoming law, Petitioners' failure to join and serve the adoptive parents limits us to deciding whether summary judgment was properly granted to respondents on the threshold issue of whether Father can revoke his consent under Wyo. Stat. Ann. § 1–22–109. Under the statute, consent may be revoked only for fraud or duress, and absent those circumstances, is irrevocable. Father's consent to the adoption was not secured by either fraud or duress and is irrevocable under Wyoming statute. All other claims are dismissed, allowing Father to pursue all other claims in the appropriate jurisdiction.

901 P.2d 381, 384 (Wyo.1995). Essential to any negligence cause of action is proof of facts which impose a duty upon defendant. *See, ABC Builders, Inc. v. Phillips*, 632 P.2d 925, 931 (Wyo. 1981). The question of the existence of a duty is a matter of law for the court to decide. *Id.* at 932. A duty exists where, "upon the facts in evidence, such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other—or, more simply, whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant." *Goodrich v. Seamands*, 870 P.2d 1061, 1064 (Wyo. 1994) (quoting W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 37, at 236 (5 th ed.1984)).